## OF THE

# SUPREME COURT OF FLORIDA,

### AT

## JANUARY TERM, 1852,

### HELD AT TALLAHASSEE.

---

FARISH CARTER, APPELLANT, *vs.* ARCHIBALD T. BENNETT, APPELLEE.

The Superior Courts of the Territory of Florida, though not Constitutional Courts, were nevertheless Courts of the United States, since they derived their existence from the legislation of Congress, under the powers conferred by the Constitution.

The Circuit Courts of the State of Florida had no right, as such, to succeed to the records and jurisdiction of the Superior Courts, though the former were held in the same places, became possessed of the records, and had jurisdiction of the same matters as those which were cognizable by the former. The validity of the transfer of causes from the one Court to the other, depends upon the concurring legislation of the two powers by which the Courts were established.

The Act of July 22, 1845, transfers all causes, civil and criminal, pending in the Superior Courts, and all common law cases pending in the County Courts, to the Circuit Courts of the State, there to be proceeded in without delay. The eighth section of said act excepts such causes as are cognizable by the Federal Courts to be organized in this State, which, it directs, shall be transferred to said Court.

All the Courts of the United States derive their authority from express grant, and can, therefore, exercise jurisdiction only in those cases where it is conferred upon them by Act of Congress. The Judiciary Act of 1789, provides for the removal of a cause of Federal cognizance from a State Court to the Circuit Court of the United States, by requiring the defendant, if he wishes to do so, to file his petition for such removal, at the time of entering his appearance in the State Court.

The Act of Congress of February 22, 1847, was designed to transfer to the United

| 4 | 283 |
|---|-----|
| 29 | 381 |
| 4 | 283 |
| 36 | 622 |
| 4 | 283 |
| 38 | 121 |
| 39 | 757 |
| 4 | 288 |
| 40 | 246 |
| 4 | 283 |
| e46 | 217 |
| 4 | 283 |
| f51 | 123 |
| f51 | 369 |
| 4 | 283 |
| f55 | 154 |
| f55 | 398 |
| 4 | 283 |
| 56 | 493 |
| f57 | 128 |
| 57 | 284 |

States Court organized in Florida, all such records of the Territorial Courts as belonged appropriately to that Court. From the precise enumeration of the classes of cases directed by the Act to be transferred, the inference is irresistible that Congress acquiesced in and sanctioned the retention by the State Courts of all the papers and records relating to other cases of which they had possession.

It is the duty of a Court to decide upon the relevancy of a particular fact when offered in evidence. If the isolated fact offered to be proved is irrelevant, it is not error in the Court to reject it, although in connection with other facts which may be subsequently proved, it may become relevant.

Where testimony, oral or written, is offered and objected to, the grounds of the objection should be stated; and if the defect is not pointed out, it is not error in the Court to admit it.

The admission of immaterial testimony cannot be assigned for error by a party where no injury could by possibility result to him from its introduction.

It is not error if a Judge omits to charge the jury upon any points of law arising in a cause, unless the point, upon which the charge is desired, is called to the attention of the Court, and an opinion thereon is refused. The Act of 1848, which requires that the Judge shall charge in writing, seems to be chiefly designed to restrain Judges from intermeddling with the facts.

The admissions of a party to a suit, either express or implied from his conduct, are strong evidence against him, but not conclusive. He is at liberty to explain them, or show that he was mistaken; and this though the admissions were under oath.

The assignment of a mortgage to a party, will not make the assignee a creditor of the mortgagor, unless it is accompanied with an assignment of the debt secured by the mortgage.

A creditor must establish his debt by judgment before he can raise the question of the validity of a conveyance made by his debtor.

Judgments may be fraudulent as well as deeds, and it is competent to the grantee in a fraudulent conveyance, to show fraud or irregularity in a judgment at law or a decree in equity, if he can.

In *trover*, possession, whether rightfully or wrongfully obtained, is a sufficient title against a mere stranger.

The question of the propriety of granting or refusing new trials, is one that must be left entirely to the discretion of the Judge who tries the cause and has heard the evidence. The practice of reviewing decisions of a Court upon motions for new trial, is wholly unknown to the judicial system of this country.

This case was brought up by appeal from a jugdment of the Circuit Court of the County of Franklin, at a Term of

the Court in said County held by the Hon. THOMAS DOUG-LAS, Judge, in the fall of 1848. The cause was argued and submitted at the adjourned Term of the Supreme Court held in the city of Tallahassee in July last, Judge BAKER of the Middle Circuit, and Judge LANCASTER of the Southern Circuit, sitting with the Chief Justice in the places of Justices THOMPSON and SEMMES, who had been of Counsel in the cause both in the Court below and in this Court.

The most material facts in the case were these—Bennett, the appellee, brought an action of trover against Carter in 1842, while Florida was a Territory, in the Superior Court of Franklin County. The cause was continued from Term to Term from the time of its commencement until after Florida was admitted into the Union, and until the Fall Term of the Circuit Court in the year 1848, when a trial was had, which resulted in a verdict and judgment for plaintiff for the sum of $19,999 66-100.

The suit was brought for the alleged conversion by the defendant to his own use of a number of slaves claimed to be the property of plaintiff.

On the trial, the plaintiff read in evidence the following bill of sale, viz:

For value received I do hereby assign, set over, transfer and convey unto A. T. Bennett the following negroes, to wit: Rica, Tom, Charles, Elias, Jeff, Isaac, Allen, Cato, John, Joe, Amy, Albert, Andrew, Pink, Charles and Henry, children of Pink, Dinah, Amarilla, Emeline, Fanny, Antoinette, Clarissa, Nancy, Ellen, Sam, Patsey, Henry, Sally, Irene, Jane and Henry, and their increase, to him, his heirs and assigns forever, without any recourse upon me or my heirs, either in law or equity.

RO. J. FLOYD, [SEAL.]

He then proved by R. J. Floyd, a competent witness, that he (the witness) and plaintiff purchased a number of

negro slaves in 1842 from one Reuben Thornton, of the State of Georgia—that after the purchase, the negroes were divided, in the schooner Magnet, at sea, between witness, plaintiff, and one Farrior, who had become interested in the bargain—that he, the witness, sold out his right in the property, executed a bill of sale, and gave possession to plaintiff—that the negroes mentioned in the bill of sale are a part of those purchased from Thornton—that the whole number purchased was seventy-six, of which Bennett had one half, and witness and Farrior a fourth each—that the slaves mentioned in the bill of sale were in the possession of the plaintiff in 1842—that they were taken from him under and by virtue of an execution upon a judgment in favor of Carter, assignee of a mortgage to the Georgia Railroad and Banking Company, executed by one Warren Jordan, and were sold by the Marshal of the Apalachicola District, Richard H. Long, Esq., of Jackson County, becoming the principal purchaser.

The plaintiff then read in evidence the following agreement of Counsel, dated December, 1846, made in reference to the cases of Bennett vs. Carter, Farrior vs. Carter, Roberts, Allen & Co. vs. Carter, and cases in which any of the parties are defendants, and Farish Carter plaintiff, viz :

We, the counsel for plaintiff and defendant, agree to admit the depositions, if properly taken, in either of the above cases to be read as evidence in all the cases, so far as the same are applicable, and so far as the same may be decided by the Court to be legal. Plaintiffs are to admit on the trial that the copy of the mortgage now of file in said Court in the case of the Georgia Railroad and Banking Company, shall be considered in lieu of the original mortgage, that said mortgage was duly executed by Warren Jordan, attested by the witnesses regularly, and that the said mortgage was duly and legally assigned by the said

company to said defendant. In other words, plaintiff is to admit the legal execution of said mortgage, and assignment, provided that the Court determines that the original mortgage and assignment presented would be legal and proper testimony in the said cases. All questions as to the legality of this testimony are reserved. Plaintiff is willing to admit further that the mortgage was recorded as stated in said copy of mortgage. It is further agreed that the following advertisement may be introduced in evidence by the plaintiff as proof of its contents :

Will be sold for cash, on the thirty-first day of December, 1842, in front of the Exchange in the city of Apalachicola, to satisfy a judgment and decree of foreclosure in favor of Farish Carter, assignee of the Georgia Railroad and Banking Company, for $16,783 and costs, and an order of sale and an execution in said case, the following negro slaves, to wit : Rica, a black boy, 17 years old ; Tom, a black boy, 18 years old ; Charles, a man, 35 to 40 years old ;. Elias, a yellow boy, 20 years old ; Pink or Gincy, a yellow woman, 22, years old ; Pink's two children, Charles and Henry ; Dinah, black woman, 35 years old ; Amarilla, a yellow girl, 5 or 6 years old ; Fanny, a yellow girl, 3 or 4 years old ; Emeline, a yellow girl, 2 years old ; Tom, a black man ; Sarah, a black woman ; Antoinette, a yellow girl, 7 or 8 years old ; Clarissa, a black girl, 14 years old ;. Camilla, a black girl, 12 years old ; Nancy and child, a woman, 35 years old ; Ellen, a girl, 10 or 11 years old ;. Sam, a black, man 30 years old.

And also, at the same place, on the 9th January, 1843, the following slaves, to wit : Jeff; a black man, 35 to 40 years old ; Isaac, a black man, 20 years old ; Allen, a black man, 29 years old ; Cato, a black man, 35 or 40 years old ; John, a yellow man, 40 years old ; Joe, a black man, 20 years old ;. Amos, a yellow man, 28 or 30 years old ;.

Patsey and child, a dark woman, 28 years old ; Sally, a black woman, 40 years old ; Andrew, black boy, 11 years old ; Albert, yellow man, 20 years old ; Irene, yellow girl, 13 years old ; Jane and child, yellow woman, 18 years old :

In satisfaction of said order and execution.

N. HAWLEY,
Marshal District of Apalachicola.

December 17th, 1842.

It is admitted by counsel for Carter that the levy therein referred to was made and directed by Farish Carter, that the negroes were sold according to the advertisement, and that the said Carter received the proceeds of sale. It is further admitted on the part of Carter's counsel, that such of the negroes named in the declaration of Bennett as are described or named in said advertisement, were in the possession of Bennett when the levy was made. That such of the negroes named in the declaration of Farrior as are described or named in said advertisement, were in the possession of Farrior when the levy was made. That such of the negroes named in the declaration of Roberts, Allen & Co. as are described or named in said advertisement, were in the possession of Roberts, Allen & Co. when the levy was made. It is further admitted by counsel for Carter that said negroes were levied on by Hawley, the Marshal, by the direction and order of the said defendant, and that in pursuance of said orders and direction of said Carter said negro slaves were taken from the possession of plaintiff, and that said levy and seizure by said Marshal was previous to the commencement of said suits, and that said negro slaves were sold by said Marshal under the direction and at the instance of said Carter, and for his use and benefit. Defendant further agrees to admit, if required by plaintiff on the trial, that defendant, Carter, has recovered

a judgment in the State of Georgia against plaintiff, Bennett, for the following named negroes, to wit: Cato, Elias, Sam, John,. Charles, Henry, Dinah, Antoinette, Fanny, Emeline, Amarilla, Nancy and Enoch, that said last mentioned sixteen negroes are a portion of those sued for by plaintiff, and contended by defendant as having been taken from Richard H. Long by plaintiff, Bennett, subsequent to these suits. It is understood that neither party admits identity of any negroes in declarations or mortgage. No understanding or agreement, not signed by the parties, is to be considered as binding. Depositions of Brown may be withdrawn, and his testimony and Milligan's to be taken if deemed fit, by plaintiff, provided Brown's depositions now taken are returned to Court, and which either party may use if they think fit, if legal testimony. Felton's testimony to be re-taken by defendant, if he deems it necessary, provided the first depositions are returned to the Court on trial. Plaintiff is willing to waive any objections as to any formalities on the envelope of Felton's depositions now on file.

December, 1846.

December 14th, 1848.

It is further agreed that the paper of 16th day of March, 1842, signed and sealed by A. T. Bennett and R. J. Floyd, and witnessed by J. C. Harris and J. M. Teague, decd., shall be read without proof of hand writings of witnesses or parties in all cases in Franklin County in which Farish Carter is a party.

The defendant, to sustain his case, relied upon the foregoing agreement of counsel, which had been adduced as a part of the plaintiff's evidence, and read to the jury the following original mortgage of Warren Jordan to the Georgia Railroad and Banking Company, viz:

Whereas, an arrangement was entered into on the 28th

day of December in the year eighteen hundred and thirty-eight, by and between Warren Jordan of said County, and the Georgia Railroad and Banking Company, whereby a loan of twenty-five thousand dollars was extended by said Company to the said Warren, on his note for that amount, dated the day and year aforesaid, payable one hundred and eighty-four days after date, to the order of, and endorsed by Reuben Thornton, of said County, and secured by a mortgage of even date on the property hereinafter described, (with the exception of lot No. 285 in the second District of Baker County in this State, containing 250 acres of land,) which said note it was agreed should be renewable every six months after the first day of January, 1839, so as to be made to fall due on the first days of July and January in each year for five successive years, from and after the said first days of July and January, or on the first discount days of said Bank succeeding the said first days of July and January, 1839, subject to a reduction of 10 per cent. at each renewal, or 20 per cent. annually, as the said Bank might thereafter require the whole amount of the twenty-five thousand dollars to be paid by the expiration or within the limits of five years as aforesaid from the said first day of January, 1839, together with all interest and expenses that might be required by said Bank, at each renewal, in accordance with its rules and regulations, not to exceed the rate of 8 per cent. per annum. And whereas, in accordance with the said arrangement, the said Warren renewed his said note so given as aforesaid for $25,000, by giving a new one, with the same endorser, to the said Georgia Railroad and Banking Company, on the first day of July, 1839, payable six months after date for $22,500, and paying the reduction and interest required by the Bank. And whereas, it being now discovered that there has been an omission to record the said mortgage, and that the time allow-

ed by the statute of the State for that purpose has elapsed, the parties have agreed to remedy the omission by the execution of a new mortgage of the same property, with the addition aforesaid, and the due record thereof, for the security of the said note of $22,500 now remaining in said Bank, and of all other notes that may be given in renewal thereof, or of each other, and of the interests and costs that may accrue on the same : To these ends, therefore :— This indenture made and entered into this 30th day of October in the year of our Lord 1839, by and between the said Warren Jordan, of the first part, and the said Georgia Railroad and Banking Company, of the second part, witnesseth, that the said Warren Jordan, for and in consideration of the premises, and the sum of ten dollars to him in hand paid by the said Georgia Railroad and Banking Company, at the sealing and delivering of these presents, the receipt whereof is hereby acknowledged, hath given, granted, bargained and sold; and by these presents doth give, grant, bargain and sell to the said Georgia Railroad and Banking Company, the following land, town lots and negroes, to wit :— fifteen hundred acres of land immediately adjoining the town of Gainesville in the said County of Hall and State aforesaid, comprising lots Nos. 149, 150, 152, 153, 167, 168, and parts of lots 154 and 136, forming one body, lying on both sides of Flat Creek, adjoining lands of Cooper, Daniel, Mitchell and others ; together with all the various buildings thereon, comprising six dwelling houses, and a great variety of other houses necessary for the different lots and settlements thereon : which said tract of land is the one whereon the said Warren now resides. Also the following improved lots in the town of Gainesville, to wit : Part of 11 and 12, with store house and improvements thereon, fronting on the public square, adjoining property belonging to Rivers on the North, and Brown on the South ; lot

2

No. 28, with the buildings and improvements thereon ; also 300 acres of land in the second and third Districts of originally Early (now Baker) County, in said State, comprising six lots on the Colewake Creek, known as Nos. 271, 272, 273, 274, 275 and 286, adjoining Dennard, John Taylor and others.   Also on Chickasalratchie Creek, No. 180, 179, 219, 220, 224, all in the second District, and 181 in the third District aforesaid : which said lots or tracts of land were conveyed by Jerry Cowles to the said Warren Jordan. Also lot No. 285 in the second District of said County of Baker, containing 250 acres.   Also the following negroes, to wit: Davy, carriage driver ; Albert, house servant ; Richard, shoemaker ; Cato, Ben, Coon, Charles, Billy, Tom, Abram, Allen, Henry, Ivey, waggoner ; Jeffrey and Horace, Jack, Toin, superior house carpenter ; Amos and Moses, good house carpenters, and Lane, making twenty-four fellows.   Also Isaac, Americus, Elias, Starling, Tom, and Rica, six lads nearly grown.   Susan and her eight children, as follows : Mariah, grown, Amelia, nearly grown, Rica, plough boy, Edenboro, Charlotte, Pompey, Sarah and William, Narcissa and her four children, Washington, Olive, Darby and Clement, Rachel and her two children Ally and Grandison, Martha, a grown woman, Dafney and Nancy, two women, Jainey and her child Caroline, Dinah and her four children, Irene, Antoinette, Marcus and Amarilla, Penny, a woman, Patty and her child, Rose and her seven children, Clarissa, Joe, Emeline, Camilla, Ellen, Araminta and Angeline ; two Sarahs, women, Patsey, a valuable cook, Mary, house servant and seamstress, Sarah, cook and washer, Fada and Rhoda, two women, Harriet and her two children, Frances and Monroe ; Siller and her child Major ; Gilbert, Ferrel and Andrew, three lads :— Together with all and singular the rights, members and appurtenances to the said lands belonging or in any wise

appertaining, to have and to hold all the above bargained property, to the only proper use, benefit and behoof of the said Georgia Railroad and Banking Company, their successors and assigns forever, in fee simple. And the said Warren for himself, his heirs, executors, administrators, the above bargained property unto the said Georgia Railroad and Banking Company, will forever warrant and defend against the claims of all persons whomsoever : Provided nevertheless, that if the said Warren Jordan, his heirs, executors and administrators, shall well and truly attend to the renewal of the said note for $22,500, now remaining in the said Georgia Railroad and Banking Company, at their office or banking house in Athens, and of all notes that may be given in renewal thereof and of each other, and punctually pay all reductions and discounts which shall become due thereon according to the true intent and meaning of these presents, so as to complete the payment of the whole $25,000 originally borrowed by the said Warren from the said Company within the five years as above specified, from the first day of January, 1839, together with all interests, costs and charges of any kind that may arise from any defalcation, and so to or cause the same to be done, then and from thenceforth, as well this indenture and the right of property thereby conveyed, as the said note now renewed as aforesaid, and all others given in renewal thereof or of each other, shall cease, determine, and be void to all intents and purposes ; but in default thereof, according to the plain tenor and meaning of these presents, the said Georgia Railroad and Banking Company shall have the right, and is hereby vested with the power, of foreclosing this mortgage, according to law, and to sell so much of the property hereby conveyed, as will satisfy all legal demands of the said Georgia Railroad and Banking Company against the said Warren Jordan growing out

of his defalcation or failure to comply with the conditions and requirements of this mortgage, and after paying all the principal, interests, cost, and charges on the same, that he, the said Warren, may by law be held liable and responsible for—the balance, if any, shall be paid over to the said Warren or to his legal representatives, and the balance of the property not sold, shall likewise be immediately [turned over] to the said Warren or to his legal representatives, re-conveyed by the said Georgia Railroad and Banking Company.

In witness whereof, the said Warren Jordan hath hereunto set his hand and seal, this 30th day of October, 1839.

WARREN JORDAN, [Seal.]

Signed, sealed and delivered in presence

of        Reuben Thornton,

George Merch, J. P.

He next offered the following original notes, purporting to be drawn by W. Jordan, and endorsed by Reuben Thornton, both dated July 1st, 1841. The one for fifteen thousand dollars, payable six months after the date thereof, and the other for six hundred and twenty-seven dollars, payable also six months after the date thereof, which notes and endorsements thereon are in the following words and figures, to wit:

$15,000.

Six months after date, I promise to pay to the order of Reuben Thornton, at the Bank of the Georgia Railroad and Banking Company, in Athens, fifteen thousand dollars. Value received.

WARREN JORDAN.

July 1, 1841.

January 4, 1842.—Endorsed, Reuben Thornton.

$627 00.

Six months after date, I promise to pay to the order of

Reuben Thornton, at the Bank of the Georgia Railroad and Banking Company, at Athens, six hundred and twenty-seven dollars. Value received.

WARREN JORDAN.

July 1, 1841.

Endorsed, REUBEN THORNTON.

Which said notes, upon motion of plantiff's counsel, were ruled out by the Court, upon the ground that they did not appear to be the debt of the mortgage, (before the necessity of proving hand writing,) and not allowed to be read in evidence—to which ruling, defendant by his counsel excepted.

The defendant then read the following assignment of said mortgage above recited, from said Georgia Railroad and Banking Company to Farish Carter:

Georgia:

Know all men by these presents that the Georgia Railroad and Banking Company, for and in consideration of the sum of sixteen thousand one hundred and thirty-six dollars and thirty nine cents, to them paid by Farish Carter, Esquire, of Scotsboro, in said State, at or before the delivery of these presents, the receipt whereof is hereby acknowledged, have bargained, sold, assigned, set over, and by these presents do bargain, sell, grant, assign, and set over unto the said Farish Carter, his heirs and assigns, a certain mortgage deed entered into on the thirtieth day of October, in the year of our Lord, one thousand, eight hundred and thirty nine, between Warren Jordan, of Hall County in said State, as mortgagor, and the said Georgia Railroad and Banking Company as mortgagees, which said mortgage deed was recorded on the day and year aforesaid in the Clerk's office of the Superior Court of said County, in book E, folios 261 to 263, and on the sixteenth day of December, in said year, in the County of Baker in said

State, in the Clerk's office of the Superior Court of the said last mentioned County, in book 7, pages 181, 182, 183, 184, 185, and 186, as by reference thereto will appear, together with the lands and negroes, houses and buildings therein mentioned and described, with the rights, members and appurtenances thereunto belonging, and all the estate, right, title and interest of the said Georgia Railroad and Banking Company therein, to have and to hold, all and singular, the premises hereby granted and assigned unto the said Farish Carter, his heirs and assigns forever, without recourse in any event to the said Georgia Railroad and Banking Company, subject nevertheless to the rights and equity of redemption of the within named Warren Jordan, his heirs and assigns in the same.

In witness whereof, John P. King hath signed these presents as President, and James Camak hath countersigned the same as Cashier of the said Georgia Railroad and Banking Company, and affixed the seal of the said corporation hereto, this thirty-first day of May, in the year of our Lord one thousand eight hundred and forty-two.

JOHN P. KING, [Seal.]<br>Pres't Ga. R. R. & B. Co.

On the part of the defendant the deposition of Reuben Thornton was next read to the Jury. This witness deposed to the following circumstances, under which he received a bill of sale of a large number of slaves from Warren Jordan, and also to the circumstances under which he alleges he sold said slaves to Floyd and Bennett, viz:

About the first of March, 1842, Warren Jordan employed Jeptha C. Harris, Esq., of Albany, Geo., to take charge of about eighty negroes, for the purpose of carrying them to Texas and settling a plantation for him, giving to Harris a power of attorney to control, protect and manage said property. Harris proceeded with the negroes to Apalach-

icola, on the steamboat Louisa, which was the property of A. T. Bennett, for which passage he paid to James Y. Smith, (who then commanded the boat,) a likely young fellow, that would now command from six to seven hundred dollars. After landing with the negroes at Apalachicola, Harris went into the custom-house, for the purpose of procuring a certificate of clearance, which appeared to be a pre-requisite to their being shipped, and while there the negroes were arrested by the deputy marshal, N. Baker, under a false attachment sued out by one John H. Watson, as agent for the Central Bank of Georgia, vs. one J. L. Hodges, and were taken from the possession of Harris, by the Marshal, and placed in jail. Harris being unable to replevy the negroes, determined to return to Georgia and inform their owner of their situation, when Bennett tendered his services to accompany him, and did go with him to the plantation of Warren Jordan, in Baker County, where Jordan was then staying. About half an hour previous to their arrival at Jordan's plantation, witness had also arrived there, and Harris and Bennett both represented to witness and Jordan the facts above detailed; they also represented Bennett as being a respectable citizen of Apalachicola, with thirty thousand dollars, for the truth of which Bennett frequently appealed to Harris' knowledge of him, &c., and stated that he was so kindly disposed to aid Col. Jordan in the liberation of his property that he had come all the way to tender him the use of his name or his services in any way that would effect that object; they further stated that Bennett and his friends had further offered to afford Harris security to replevy the negroes, which could not be done under the power of attorney he then had; they had, therefore, come to the conclusion that it would be best to obtain a bill of sale to the negroes from Warren Jordan to Harris, for the purpose of enabling Harris to

claim the negroes, which being done, there would be no
further difficulty in replevying them, as Bennett and his
friends could and would give any security that the mar-
shal would require.  As witness was there, Harris propos-
ed to Col. Jordan to intercede with witness to go with
them to Apalachicala, and to make to him a bill of sale to
the negroes, for the purpose of replevying them.  This ar-
rangement Bennett strongly backed, and urged both to Col.
Jordan and witness that the bill of sale should be executed
to him.  Witness objected, and replied to his proposition
that he had a power of attorney from Warren Jordan, reg-
ularly executed and recorded, constituting him his agent
in any State or Territory in the Union, which was amply
sufficient to enable him to replevy the negroes—to which
Bennett replied that his friends at Apalachicola were re-
spectable and wealthy merchants, but they knew but little
about legal matters, and they had been advised by counsel
that the negroes could not be replevied unless the person
had a bill of sale to them, and that unless he took one, it
would be out of his power to afford him the aid he desired
to do.  It was finally settled and agreed that witness
should take the bill of sale, upon a pledge of honor from
Bennett, made both to Jordan and witness, and over and
over repeated, that himself and his friends would afford
ample security to enable him to replevy the negroes.  Un-
der these promises, and for the satisfaction and gratification
of Bennett, witness received the bill of sale from Jordan to
the negroes, to which Bennett and Harris were subscribing
witnesses, and for the sole and only purpose of enabling
him to replevy them for the benefit of Warren Jordan, who
was the true and bona fide owner of them.  In the event
of witness having to claim the negroes personally, he
thought it best to execute his note to Jordan for something
like the value of the negroes, and some money was laid on

the table at the time the bill of sale was signed, and which was taken up again by witness in the presence of the witnesses to the bill of sale, and put in his pocket, they knowing that not one cent was actually paid, or even intended or expected to be paid, and that the note which was executed by witness to Jordan was not accepted, or intended by either of them ever to be paid, which facts were as well known and understood by Bennett as by themselves, the whole being done to place matters in a form to please Bennett, and thereby secure his promised aid in procuring the security necessary to replevy the property.

—That on the arrival of witness at Apalachicola, he found it impossible, in consequence. of the character and amount of the bond required, to replevy the negroes—that Bennett could not render him the assistance which he had promised, and that he then determined to make it the interest of some person to aid him in his object and purposes, by making an offer of a portion of the negroes as an inducement. This he accordingly did, but was not successful—that he finally sold the negroes to Bennett and Floyd, as they were, in the jail of Franklin County, stating to the purchasers at the time that he had no valid title to them, and that he did not mean by the sale to interfere with the rights of Warren Jordan or his creditors.

He moreover required from Bennett, as a condition of sale, a written acknowledgment under the hands and seals of himself and Floyd, that they bought the negroes without delivery, as they stood in the possession of the Marshal, "subject to all the liabilities that were against them in the way of debt, either by note, judgment, or mortgage, in the State of Georgia, either as the property of" Jordan or himself, which paper, bearing the same date as the bill of sale made by witness, is in these words, viz: .

3

TERRITORY OF FLORIDA—FRANKLIN COUNTY.

Whereas, Reuben Thornton, of the County of Hall and State of Georgia, has this day sold to R. J. Floyd and A. T. Bennett, the following negroes, which are now in the hands and possession of the Marshal under an attachment sued out against one J. L. Hodges, to wit: old Tom, Dick, Allen, Cato, Charles, Gilbert, Amos, Merida, Elias, Jack, Abram, Major, Ben, Sam, Jeffrey, Rica, Moses, Americus, Albert, Billy, Isaac, John, Coon, Joe, making twenty-four fellows; Grandison, Fayett, Andrew, Virgil, Washington, Tom, Marcus, Clem, William, Monroe, Wylie, Charles, Simeon, making thirteen boys; Sarah, Martha, Patsey, Jane, Susan, Narcissa, Jinsey, Dinah, Harriet, Fada, Mariah, Milley, Rachel, Penny, Sally and Nancy, making sixteen negro women; Charlotte, Caroline, Antoinette, Camilla, Frances, Lucinda, Ellen, Sarah, Amanda, Fanny, Avarilla, Mary, Crissa, Abby, Clarissa, and Jenny, making seventeen girls; Jenny, William, Henry, Albert, Cornelius, Randle, Henry, and Emeline, making eight infants, which said negroes are sold by the said Thornton to us, the said R. J. Floyd and A. T. Bennett, subject to all the liabilities that are against them in the way of debt, either by note, judgment, or mortgage in the State of Georgia, either as the property of Warren Jordan or the said Reuben Thornton, the said Reuben only warranting the same against himself and his heirs. This is therefore given by us to show that if any of said property should be lost by suit in consequence of any claims as aforesaid, that it is to be no offsett or plea against the payment of the note of seven thousand dollars, bearing even date with these presents, given by said Bennett and Floyd in payment for said negroes, as witness our hands and seals, this 16th day of March, 1842.

R. J. FLOYD,      [SEAL.]
A. T. BENNETT, [SEAL.]

Which acknowledgment, under the hands and seals of Floyd and Bennett, was signed, sealed, and delivered in the presence of J. C. Harris and J. M. Teague.

The defendant then exhibited to the jury the record of the proceedings, and decree and judgment of foreclosure in the case of Farish Carter, Assignee of the Georgia Railroad and Banking Company—the execution issued thereon, together with the necessary evidence of levy and sale by the Marshal.

There was a vast amount of other testimony introduced and read on the trial of the cause, not however deemed material to be herein set out or stated.

The following instructions were asked by defendant's counsel, viz:

1st. That a party cannot be admitted to gainsay or deny his own solemn oath of record made in this Court, setting up the facts sworn to as a defence in the action, and when such oath is introduced to the jury, it is conclusive against the party making such oath, and the highest possible evidence—which first instruction was refused by the Court, and instead thereof, the Court gave the following:

Instruction first given. Instead of the first, I state to the jury, that a party cannot be admitted to gainsay or deny his own solemn oath of record made in a Court, setting up the facts sworn to as a defence to the action; but he may be permitted to explain it, and to show that it was made in ignorance of his rights, or under a misapprehension in regard to them.

2d. Second instruction asked. That a party cannot claim title to property in any Court of this State, when such claim comes through such facts as are sworn to in the plaintiff's affidavit introduced in this trial, dated 24th July, 1844, and filed in the suit of Charles T. Thornton, to foreclose a mortgage against Bennett and Floyd, a copy of

which is herewith filed, marked A. Such affidavit is conclusive against Bennett, as proof of the facts there sworn. The following is the affidavit referred to :

FRANKLIN SUPERIOR COURT, ON PETITION TO FORECLOSE MORTGAGE.

A. T. Bennett, impleaded with R. J. Floyd,
*ads.*
Charles T. Thornton.

The defendant, in pursuance of law, files herewith the following objections to the decree of foreclosure, herein protesting in the first place that the plaintiff is not entitled to the same, for objections apparent in the said proceedings, for which the same should be dismissed. The defendant sets forth that the note of $7,000 which said mortgage was given to secure, was made and executed in consideration and payment of certain negro slaves sold to defendant on the 16th day of March, in the year 1842, the same being specially set forth in a bill of sale executed by one Reuben Thornton to defendants ; that said slaves, being the property of one Warren Jordan in the State of Georgia, were fraudulently, clandestinely, covinously, collusively, wickedly, illegally, and improperly, against the laws of said State run off, removed and carried away from said State by said Jordan and said Reuben Thornton, said removal being made, executed, contrived and devised of fraud, covin, collusion and guile, to convey them from said State out of and beyond the United States, to Texas, to the end, purpose, and intent to convert them to their own use and profit, and to delay, hinder, and defraud the Georgia Railroad and Banking Company and others, to whom said slaves had been mortgaged, and other creditors in said State of Georgia, contrary to the laws of said State ; that the sale to said defendants by the said Thornton and the giving and taking of the said note of $7,000 and its assign-

ment to plaintiff, was in pursuance and consummation of the same wicked, fraudulent, corrupt, illegal, covinous and improper design, contrivance and purpose, and the assignment of said note to said plaintiff was under suspicious circumstances not in the usual course of trade, without consideration and fraudulent; that said negroes being over the age of twelve years were imported into this Territory by said Jordan on the — day of March, 1842, from said State of Georgia, without any design of making a settlement in this Territory, and without having obtained a certificate signed by a Judge of the County Court or two Justices of the Peace of the County from which they were brought, containing a particular description of the stature and complexion of said slaves, together with their names, ages, and sex; and furthermore, that they have not been guilty of or committed murder, burglary, arson, or other felony within such State, as required by the laws of the Territory, and in defiance thereof, and further, that said slaves having been brought into this Territory as merchandize, were sold to defendants by said Thornton on the — day of March, 1842, at Apalachicola, in the Territory of Florida, where they were first sold in this Territory without coming to be registered with the Clerk of the County Court of Franklin County, the certificate required by law as aforesaid, containing a particular description of said slaves as aforesaid, and that they were not guilty of and had not committed murder, and the other crimes aforesaid, in said State, and that said slaves were sold to defendants by said Thornton and said Jordan, without having obtained the certificate of description required by said statute, and without complying with the law of this Territory entitled an act relating to crimes and misdemeanors committed by slaves, free negroes, and mulattoes. And defendant saith that on account of the defences and causes herein set forth,

as well as in the action at law on the said note to which he refers, and makes a part of his objections herein, he ought not to be compelled to pay said note and mortgage, the same being on account thereof, and the reasons and causes herein set forth, null and void.

THOMAS BALTZELL,
*For Defendant*, BENNETT.

TERRITORY OF FLORIDA, JACKSON COUNTY.

Before me personally appeared A. T. Bennett, defendant in the above suit, who being duly sworn, saith that the matters above stated, so far as they are inserted from his own knowledge and belief, are true, and so far as made from the knowledge of others, he believes to be true.

A. T. BENNETT.

Sworn and subscribed before me, 24th July, 1844.

R. BALLARD, J. P.

Which was written across by the Court and refused in these words : " Refused because the law is so mixed with fact in the instruction asked, that one cannot be given without the other."

3d. Defendant next asked his third instruction in these words : that no man can claim title to property sworn by himself to have been acquired by a direct violation of the statute of frauds, as against the parties intended to be defrauded, (which the Court altered by adding thereto the words, " unless he shews that he made such oath under a misapprehension as to the law or the facts or the evil,") which instruction, so altered, the Court gave.

4th. The defendant then asked his fourth instruction, viz: That running off mortgaged negroes is felony by the law of Georgia, punishable by confinement in the penitentiary, and no man can claim property acquired through a felony, with notice of the facts, and his own affidavit of the facts is conclusive upon him. And defendant's counsel offered

to read to the Court said Georgia statutes from a printed statute published and printed under and by authority of the State of Georgia. (This offer to read the laws of Georgia was not made, however, by defendant's counsel until the argument of counsel on both sides had closed, and after instructions had been prayed for and given up to instruction 4th.) Which the Court refused to hear read, and refused to give the instruction, and wrote thereon these words : " What the law of Georgia is must be proven."

5th. The defendant's fifth instruction then asked—the Court then gave, after including therein the words here written in brackets, that a voluntary bill of sale, in which no money is paid, [or other valuable consideration given,] carries no title against prior creditors, especially mortgage creditors ; and even if another person should buy for money, with notice of the person holding under such bill of sale, such new party can claim no title against prior creditors or mortgagees.

Defendant's sixth instruction was then given by the Court in these words, without alteration viz : that a mortgagee has an absolute title, subject to be defeated by payment at the day, and after the day passed, the mortgagor has no title whatever at law, and an action of trover cannot be maintained by him or his assignee.

7th. The Court next gave, without alteration, defendant's seventh instruction, viz : After mortgage is past due, the title in personal property is fixed in the mortgagee, and he cannot be guilty of a conversion, because the property is in the mortgagee, and trover cannot be maintained against him.

8th. The Court then gave, without alteration, defendant's eighth instruction, viz : The equity of redemption is only a title in equity—can only be set up in equity, and even there the party must come with clean hands and the

utmost purity; the least fraud would put him out of Court.

9th. Defendant's ninth instruction [is] in these words : That the title to the sixteen (thirteen) negroes mentioned in the action of trover in Georgia, was decided in that case to be in Farish Carter, and the jury cannot reverse or review that decision, and must throw that number of negroes from their consideration—which the Court refused, writing thereon " refused," because involving facts upon which the Court is prohibited from instructing the jury.

10th. The tenth was waived and erased.

11th. The eleventh was given, without alteration, by the Court thus : That a claim bond without securities is no claim bond, and an attachment which contains no description of personal property, and an affidavit which gives no description of the property, amounts to no claim under the statute, and would be disregarded by the Court.

12th. The defendant's twelfth instruction was then given by the Court, without alteration, viz : When a party claims under another whose rights have been regularly adjudicated, such adjudication bars the party so claiming.

13th. Defendant's thirteenth instruction was in these words : The record in the case of Peninah W. Thomas vs. Farish Carter being in evidence before the jury, and commented on by plaintiff, is conclusive as to any subject matter decreed upon in said record; and if the record shows that a foreclosure has been had in Georgia on the personal property by said mortgage conveyed on the fifth July, 1842, the titles to the personal property became absolute in the mortgagee—an action of trover for said personal property, subsequently commenced by the mortgagor, or any person claiming by, through or under him, cannot be maintained—which the Court refused, writing

on the same "refused," because it is not conclusive against any but those who are parties or privies to the record.

14th. Defendant's fourteenth instruction was then given, without alteration, except the addition in brackets at the end, viz: A party whose title is tainted with fraud, cannot rely upon such title to object to the regularity of a decree rendered in favor of the creditor against the debtor, who did so fraudulently part with his title; and this will apply in the case of a foreclosure of mortgage by mortgagee, against mortgagor, where the decree is attacked by any one claiming title under a mortgagor who has fraudulenly conveyed his equity of redemption to hinder and delay the mortgagee, [such person being cognizant of the fraud at the time of his purchase.]

15th. Defendant's fifteenth instruction was then given by the Court, without alteration, to wit : If a common law judgment is rendered against a party who could not there defend his rights, a Court of Equity will interfere by injunction, upon proper showing, to stay the proceedings at law.

16th. The defendant then asked his sixteenth instruction, in the words following, which the Court refused as written, but gave with the additional words in brackets below, viz: In cases of foreclosure at common law under our statute, any person claiming by, through or under a mortgagor, can come in and state his objections, under oath, showing cause against foreclosure of the mortgage property—to which the Court added, ["provided, he is served with legal notice, either personally or by advertisement."]

17th. The Court gave defendant's seventeenth instruction, without alteration, viz: The doctrine of notice applies only to bona fide purchasers.

18th. Defendant then asked an instruction that plaintiff, to maintain trover, must prove as follows :

1st. That he had a right to the property claimed, and was entitled to the immediate possession of the same at the time the action was commenced. Which was given.

2d. That plaintiff must prove a conversion by the defendant at or before the commencement of the action. Which was given.

3d. That no such property or possession can be maintained against a prior creditor of the vendor, Thornton or Jordan, unless such property or possession was obtained bona fide. Which was refused by the Court, and written upon " Mixed with fact."

4th. That a possession obtained by fraud cannot be set up as a possession in which to sustain trover. Which was given by the Court.

To all of which several rulings and opinions of said Court against defendant upon the questions of evidence, and refusals to charge and instruct, and alterations of instructions, defendant, by his counsel, excepted, and prayed that his bill of exceptions might be signed and sealed by the Court, which was accordingly done ; and this constituted the defendant's first bill of exceptions.

After the rendition of the verdict in this cause, the defendant's counsel moved for a new trial, on the following grounds to wit :

1st. The verdict is against the law, and against the instructions of the Court.

2d. Against the evidence.

3d. Against the weight of evidence.

4th. Excessive damages.

5th. Verdict gives interest as well as hire and excessive valuations.

6th. Verdict exceeds the whole amount claimed and the

amount of all the slaves, as valued in the declaration mentioned, when plaintiff, at the trial, admitted, and the same was proved, the re-capture of sixteen of said negro slaves, and abandoned his suit for the same.

7th. The verdict is indefinite, in finding costs as part of the damages.

8th. The jury gave a verdict beyond the value of property proved by any evidence.

9th. Surprise in ruling out testimony by the Court.

10th. Because plaintiff claims title through an act which it appears by his own oath, unexplained, was a felony in Georgia.

11th. Because no conversion was proved, and said verdict is in other respects unlawful and informal.

Which said motion was overruled by the Court, and a new trial refused, to which refusal and opinion, defendant, by his counsel, excepted; and this constituted defendant's second bill of exceptions.

And said motion for a new trial having been overruled as aforesaid, the said Court adjourned until Tuesday, the 26th, at nine o'clock, the 24th being the Sabbath, and the 25th Christmas day, and on the opening of the Court on Tuesday, the defendant, by counsel, moved the Court in arrest of judgment, and that said cause be dismissed from this Court, with the order to the Clerk to transfer the papers to the District Court of the United States for the Northern District of Florida, or hold said papers and proceedings subject to any order of transfer or demand from said District Court, and upon said motion defendant's counsel shewed to the Court that this cause was instituted by a writ of which the following was admitted by counsel of plaintiff to be a true copy, as well as of the endorsements thereon, the original having been lost or mislaid :

IN THE NAME OF THE TERRITORY OF FLORIDA.

*To the Marshal of the Apalachicola District—Greeting.*

We command you that you summon Farish Carter to be and appear before the Judge of the Superior Court of Franklin County, at a Court to be held in the city of Apalachicola on the fourth Monday of March next, to answer Archibald T. Bennett of a plea of trespass on the case, damages twenty thousand dollars, and have then and there this writ.

Witness, George F. Baltzell, Clerk of our said Court at Apalachicola, this 17th day of December, 1842, and of the Independence of the United States the sixty-seventh year.

(Signed,)    GEORGE F. BALTZELL, *Clerk.*

On which writ were the following endorsements :

Archibald T. Bennett vs. Carter.    Summons issued 17th December, 1842.

Served by handing a copy to Farish Carter, December 17th, 1842,

RICHARD J. YOUNG,
*Deputy Marshal, for*
H. HAWLEY, *Marshal.*

The declaration and plea were then exhibited to the Court, and the various entries made on the record of the Superior Court of Franklin County, prior to the third of March, 1845, as well as those made subsequent to the admission of Florida into the Union.

Defendant then offered to prove that Farish Carter was, at the commencement of said action, and has been at all times since, a citizen and resident of the State of Georgia, which fact was admitted by counsel for plaintiff.

Plaintiff then showed, by the evidence of William Valleau, Clerk of this Court, that after his election as such Clerk, at the first State election, holden in 1845, he re-

ceived from George F. Baltzell, the late Clerk of the Superior Court of Franklin County for the Apalachicola District, the records of said Court, and all the papers in the said cause, which are now in Court, and that said papers were by him filed, and so have since remained in this Court.

And the following order hereto appended from the District Court of the United States, was served upon him, but he did not give up or surrender the papers, records and proceedings in these cases, or any of them :

In District Court of the United States, for the Northern
District of Florida.

AT JUDGE'S CHAMBERS,                  ⎫
  *St. Augustine*, 29th March, 1847. ⎬

Whereas, in and by an act of Congress, approved 22d February, 1847, entitled an " Act to regulate the exercise of the appellate jurisdiction of the Supreme Court of the United States in certain cases, and for other purposes," it is enacted that all and singular the records of the proceedings in the several cases which were pending in the Superior Court of the late Territory of Florida, under and by virtue of the act of Congress of the 23d May, 1828, entitled an Act supplementary to the several acts providing for the settlement and confirmation of private land claims in Florida, approved 26th May, 1830, and in the several cases which were pending in the Court of Appeals of the same Territory on the third day of March, 1845, and all and singular the records of the proceedings in the several cases in which judgments or decrees have been rendered in said Courts, on or before that day, and from which writs of error could have been sued out, or appeals could have been taken, or from which writs of error had been sued out, or appeals had been taken and prosecuted to the Supreme Court of the United States, according to the laws of the

United States which were in force on the said third day of March in the year of our Lord one thousand eight hundred and forty-five, shall, from and after the passage of the first above recited act of Congress, of the 22d February, 1847, be transferred to and deposited in the District Court of the United States for the District of Florida :

And whereas, it is further enacted in and by the second section of the said act of Congress, approved 22d February, 1847, that it shall be the duty of the Judge of the District Court of the United States for the District of Florida, immediately after the passage of said act to cause the same to be notified to the several Clerks of the Superior Courts, or to other officers or persons having in their possession or custody the records of the proceedings herein above referred to and described, and to demand the delivery of the same, to be deposited as above specified and required, and on the refusal of such Clerk, or other officer or person, to comply with such demand, the said Judge is authorized and required to compel the delivery of said records, by attachment, or otherwise, according to law :

And whereas, in and by a subsequent act of Congress, approved 23d February, 1847, entitled an Act to establish a Court at Key West, in the State of Florida, and for other purposes, it is enacted that the title and name of the said District Court of the United States for the District of Florida shall hereafter be " the District Court of the United States for the Northern District of Florida :"

· Now, therefore, in pursuance of the provisions of said act of Congress herein first above recited, approved 22d February, 1847, it is hereby ordered by the Judge of said District Court of the United States for the Northern District of Florida, that the Marshal of said District, either by himself or by any one of his deputies, be and he is hereby authorized and required to make known the afore-

said act of Congress of the 22d February, 1847, to the late Clerk of the Superior Court of the Apalachicola District in the County of Franklin, and to the present Clerk of the Circuit Court of Franklin County, or to any other persons within the late Apalachicola District of the Territory of Florida, who may have the possession and custody of any of the aforesaid records of the proceedings in the cases above mentioned. And it is further ordered, that the said Marshal or his deputy shall cause a copy of this order, duly certified under the hand and seal of the Clerk of this Court, to be served personally on each and every of the officers or persons above mentioned, and at the same time shall demand from the person on whom the same shall be served, a delivery (in pursuance of the act of Congress last mentioned) of the aforesaid records herein before mentioned, or of such or so many of such records as may be in the possession and custody of such person, and the said Marshal or his deputy is hereby authorized and empowered to receive from each or any of the persons or officers aforesaid so notified by him any of the aforesaid records, which such person or officer may deliver to him, and to deposit the same with the Clerk of this Court at Apalachicola, or such records may be delivered by the persons or officers having possession and custody of them directly to or deposited with the said Clerk of this Court at Apalachicola.

And it is further ordered, that the Marshal who shall serve this order and make demand of said records as aforesaid, shall respectfully request of each of said officers or persons on whom the same may be served, a written reply or answer to said demand, and also a written schedule of any records or papers, which may be delivered by such officer or person either to him or the Clerk of this Court in pursuance of the foregoing act of Congress or this order. And it is further ordered, that the said Marshal or his dep-

uty shall, without delay, make full and particular return in regard to the execution of this order, and of his doings herein, to the Judge of the District Court of the United States for the Northern District of Florida. And it is further ordered, that this order be entered of record by the Clerk of said Court at Apalachicola, and copies furnished without delay to the Marshal or his deputy for service.

(Signed,)              I. H. BRONSON,
*Judge U. S. District Court for the*
*Northern District of Florida.*

I, Joseph S. May, Clerk of the District Court of the United States for the Northern District of Florida, in the Apalachicola District, do hereby certify that the foregoing is a true copy of the original order now on file in my office of said Court.

In testimony whereof, I hereunto set my hand and [SEAL.] affix the seal of said Court, this the 28th day of December, 1848.

JOSEPH S. MAY,
*Clerk U. S. District Court.*

Defendant having made these facts apparent to the Court, contended and stated, in support of his motion aforesaid, that it was manifest to the Court that this cause was commenced and came to issue in the District Court of the United States for the District of Apalachicola, sitting as the Superior Court of Franklin County, in the then Territory of Florida, a Court established by the Congress of the United States, and under its jurisdiction and control; and because it does not appear how the said cause, and the records and papers of the same, were ever legally transferred to this Court, or that the same have ever been so transferred, or that the same are not yet legally remaining in the said Territorial Court's office, or that the same have not been removed, and said cause been tried or dismissed, or

yet remains pending in the District Court of the United States ; and because the Courts established by the Government of the United States have the exclusive right to hear and determine all causes legally commenced in the Courts established by said Government, unless the same be prevented by act of Congress, or the consent of the parties ; and because, by the act of Congress of 22d February, 1847, entitled an act to regulate the exercise of the appellate jurisdiction of the Supreme Court of the United States in certain cases, and for other purposes, all the judgments, papers and records of said Superior Courts of the Territory of Florida, were transferred to the District Court of the United States, and all cases pending in any of the Superior Courts of said Territory of Florida, on the third day of March, A. D. 1845, and not legally transferred to the said Courts of Florida, and which are claimed to have been pending in said Courts after said day, were, by said act, transferred to the District Court of the United States for the District of Florida, afterwards called the Northern District of Florida.

And defendant insisted that said act of Congress, *proprio vigore*, transferred said cause to said Court, the same having been pending in said Court at said time, and never legally transferred to any State Court, and that this Court had not then, and never had, jurisdiction to hear and determine said cause so commenced and pending as aforesaid.

And defendant further referred to the law of Florida of the twenty-second day of July, 1845, by which only such causes are attempted or pretended to be transferred from the Territorial Superior Courts to the Circuit Courts of the State, as are not cognizable by the Federal Courts, and contended that this cause was commenced in a " Federal Court by personal service upon him, and is and hath been

at all times since cognizable in a Federal Court, and never was transferred legally, or cognizable in this Court."

And defendant further showed that, since said act of Congress of 1847 was passed, there had been no Judge presiding in this Court, who could (as he contended) take any action in this case under the laws of this State, until the present term. The only Judges who had, since the passage of said act of Congress of 1847, presided in this Court, having been the Honorable Thomas Baltzell and the Honorable George S. Hawkins, as was proved by inspection of the record, and both of whom it appeared by the record had been attorneys and counsellors in this case, and the same was admitted, and defendant therefore only had power to continue said causes ; and defendant contended that the continuances before recited as entered in this cause in this Court, were null and void, and of no effect, this Court never having had possession or jurisdiction of the same at any time.

But said Court having heard argument of counsel on said motion, overruled the same, and gave judgment for the plaintiff—to which opinion and overruling defendant by his counsel excepted, and prayed that his bill of exceptions might be signed and sealed by the Court, which was accordingly done ; and this constituted defendant's third bill of exceptions.

The defendant then moved in arrest of judgment, on the following grounds, to wit :

1st. That this Court has no jurisdiction to try the said cause, because the record and proceedings therein of right belong to the District Court of the United States for the Northern District of Florida, holden in the city of Apalachicola, the same being a part of the unfinished business —it being a case pending in the Superior Court of the Territory of Florida at and after the the third day of March,

1845, viz : the Superior Court of the Apalachicola District of Florida, being a Territorial Court, created and continued by act of Congress, up to the admission of Florida as a State, from which time the said Court became defunct, and the proceedings therein abated, until the same were transferred by act of Congress, passed in 1847, to the District Court of the United States for the Northern District of Florida.

2d. Because Hon. GEORGE S. HAWKINS, Judge of the Western Circuit of Florida, was of counsel in this cause —which fact defendant offering to prove, was admitted by plaintiff's counsel—and because the Legislature of Florida, at its session holden in January, 1848, made special provision for the time and manner in which the said case should be tried, and also prescribed how the Judge should be selected who should try the same ; that this case is included in the class of cases about which special legislation has been had, and the trial of said cause at this term, by the Hon. THOMAS DOUGLAS, as presiding Judge, who is commissioned only as Judge of the Eastern Circuit, and not of the Western Circuit, is in direct opposition to the Act of January, 1848, in this—that the right to appoint a Judge to try causes in which the resident Judge is interested, or was of counsel or attorney, is given to the Supreme Court of the State, and not to the resident Judge so interested.

3d. That it does not appear that the requisitions of the law have been complied with by the resident Judge, GEO. S. HAWKINS, Judge of the Western Circuit, he not having made a report of the cases in which he was interested as counsel, of which this is one, to the Supreme Court to be holden after the passage of said act.

4th. That the cases in which the resident Judge is interested as counsel, of which this is one, are postponed for

trial until after the session of the Supreme Court, which does not occur until the first Monday in January next, and then they are to be tried at a subsequent term, to be designated by the Supreme Court.

5th. That such time has not arrived, such Judge has not been appointed, and the said case, which is one of those provided for by the act of the Legislature approved by the Governor of the State of Florida January 4th, 1848, has not been reported by the resident Judge to the Supreme Court of the State, as by said act required. Which motion the Court overruled, and to which overruling defendant, by his counsel, excepted, and prayed that his bill of exceptions might be signed and sealed by the Court, which was accordingly done; and this constituted the defendant's fourth bill of exceptions.

The errors assigned are twenty-eight in number, and are as follows, to wit:

I. The Court erred in giving judgment for plaintiff below, because the action was brought in December, 1842, in the Superior Court of Franklin County, Territory of Florida, and in said Court continued until the 17th of February, 1845, when it was ordered that this cause be continued, by consent of counsel, until the *next term*, whereby it appears that this cause is yet pending in the District Court of the United States for the District of Apalachicola, (a Court of Federal cognizance and jurisdiction,) unless removed by act of Congress to some other Court, and the Circuit Court had no jurisdiction to give judgment in this cause.

II. Because it nowhere appears by what rule, law, authority or order said Circuit Court obtained jurisdiction to hear and determine said cause so commenced and continued in the said Superior Court of Franklin County, Territory of Florida, and the record showing that the cause was so commenced in another Court and another jurisdiction, it

must appear, to give validity to the decision of the Circuit Court, that such cause came into said Circuit Court lawfully and regularly for decision, and not so appearing, said decision must be reversed.

III. Because the Court erred in ruling out the notes offered in evidence by defendant.

IV. And in admitting the plaintiff's depositions of Ephraim W. Johnson and Minor W. Brown.

V. Because the Court erred in admitting plaintiff's deposition of Benjamin F. Griffin.

VI. And the deposition of George W. Collier for plaintiff.

VII. And the bonds and affidavit introduced by plaintiff as his rebutting testimony, marked No. 10.

VIII. Because the Court erred in excluding defendant's testimony of the clearance of the slaves at the custom-house for New Orleans, and the certificate of Nathan Baker appended thereto, referred to in the testimony of said Baker.

IX. The Court erred in refusing to instruct the jury generally upon the points of law arising in the case when called upon by counsel, and in its construction of the statute of 1848 upon that subject.

X. The Court erred in refusing the first special instruction asked by defendant's counsel ;

XI. And in giving the modified instruction in lieu thereof, there being no facts of ignorance or misapprehension of rights whatever proved to justify this modification.

XII. And in refusing the second special instruction asked by defendant.

XIII. And in the addition or qualification made to defendant's third special instruction asked, there being no evidence to justify said addition.

XIV. And in adding the qualification ("or other consideration given,") to defendant's fifth instruction, there

being no evidence to authorize it, and the bills of sale purporting to be for money.

XV. The Court erred in refusing defendant's ninth instruction.

XVI. And his thirteenth instruction.

XVII. And in adding the qualification in brackets to defendant's fourteenth instruction, to wit : "Such person being cognizant of the fraud at the time of his purchase," and in refusing to give such instruction as asked, without qualification.

XVIII. And in refusing the sixteenth instruction of defendant as asked, and adding the qualification, "provided he is served with legal notice, either personally or by advertisement,"—the same being unnecessary under the statute, and the qualification calculated to mislead.

XIX. The Court erred in refusing to give the third clause of defendant's eighteenth instruction.

XX. And in refusing his motion for a new trial.

XXI. The Court erred in refusing to arrest the judgment and dismiss the cause, and order the Clerk to transfer the papers to the District Court of the United States.

XXII. And in not arresting the judgment for reasons assigned in defendant's fourth bill of exceptions.

XXIII. That Thomas Douglas, who rendered the judgment, committed error in so doing in* this—that he was elected and commissioned as Judge of the Eastern Circuit, and George S. Hawkins was elected and commissioned as Judge of the Western Circuit, and Franklin County is in said Western Circuit, and said Hawkins had been of counsel in this cause, and in such case said Hawkins had no power to preside himself, or to select the Judge who should preside in his place at the trial of this cause ; but it was provided by the act of January 4th, 1848, that the selection of the Judge who should try such causes should be

vested in the Supreme Court of the State, whose duty it is made in such case to assign one of the Judges thereof, not interested, or otherwise disqualified to try such cause, and said Thomas [Douglas] had not been selected or assigned, but only claimed to sit as by request of said Hawkins.

XXIV. That said Douglas erred in entering judgment upon said verdict—the same being illegal, having been rendered by twelve men not authorized by law, and without the presence of the Judge of said Court, George S. Hawkins, during the trial of said cause.

XXV. That the Court erred in rendering judgment, because the verdict is general for the plaintiff on the issue for more than the whole amount of damages claimed, when plaintiff in open Court admitted the capture of certain of the slaves, to wit: sixteen in number, amounting to the aggregate value of $ ———, and abandoned his action as to them—and yet the verdict finds for plaintiff for all, and makes no distinction.

XXVI. The Court erred in rendering judgment upon the verdict, which is for more than the aggregate of all the values in the declaration alleged, for all the slaves not recaptured and abandoned in this action—and there is no count or claim in the declaration for any further amount than such value—no claim for interest or hire, and as to that, no issue no litigation, no suit.

XXVII. The judgment should be reversed, because it appears by the record that the Court had no jurisdiction of the cause—the Judge no commission to try the cause, if the Court had had jurisdiction—and the judgment is for an amount and for property not in litigation between the parties.

XXVIII. The Court erred in not dismissing the action, when it was shown by plaintiff's affidavit in a court of re-

cord, and corroborated by other testimony, that the action was based upon and intended to sustain a fraud and felony.

*Archer, McDonald* and *Colquitt,* for Appellant.

*Davis,* for Appellee.

ANDERSON, *Chief Justice,* delivered the opinion of the Court.

This was an action of trover brought by the appellee against the appellant in the County of Franklin, to recover damages for the alleged conversion of a number of negro slaves.

On the trial in that Court, at the Fall term of 1848, there was a verdict and judgment in favor of plaintiff for the amount of $19,999 66-100.

The case was brought by appeal to this Court. The errors assigned, being twenty-eight in number, we propose to consider in the order presented by the record, and to make such reference to the facts of the case as may be necessary to the proper understanding of the points upon which we are called to decide.

The first and second errors assigned—which we shall consider together as presenting substantially the same question—are in the following words :

" 1st. The Court erred in giving judgment for the plaintiff below, because the action was brought in December, 1842, in the Superior Court of Franklin County, Territory of Florida, and in said Court continued until the 17th of February, 1845, when it was ordered that this cause be continued, by consent of counsel, until the *next term,* whereby it appears that this cause is yet pending in the District Court of the United States for the District of Apalachicola, (a Court of Federal cognizance and jurisdiction,) unless removed by act of Congress to some other Court,

and the Circut Court has no jurisdiction to give judgment in this case.

" 2. Because it nowhere appears by what rule, law, authority or order said Circuit Court obtained jurisdiction to hear and determine said cause so commenced and continued in the said Superior Court of Franklin County, Territory of Florida, and the record showing that the cause was so commenced in another Court and another jurisdiction, it must appear, to give validity to the decision of the Circuit Court, that said cause came into said Circuit Court lawfully and regularly for decision, and not so appearing, said decision must be reversed."

The facts upon which this denial of the jurisdiction of the Circuit Court is founded, are briefly as follows :

The action was commenced in December, 1842, in the Superior Court of Franklin County, while Florida was a Territory of the United States.

It was continued from term to term till the 17th of February, 1845, on which day the following order was made, viz : " Ordered that this cause be continued, by consent of counsel, until the next term." On the 3d of March of the same year Florida was admitted into the Union as a State, and the new State Legislature having proceeded with as little delay as possible to organize a State Judiciary, the State Courts were held in the respective Counties at the Fall terms.

In December, 1845, the order of the State Court sitting in Franklin County, in relation to the case before us, was as follows, viz : " Ordered that this cause be continued."

At the Spring term, 1846, we find a similar order. At the Fall term, 1846, the parties appeared, by their attorneys, and argued a motion made by the plaintiff to rule out certain depositions, and the cause was again continued.

There was no Spring term held in 1847, and at the Fall

term of that year, and the Spring term of 1848, the same orders of continuance were made. At the Fall term, 1848, the parties came, by their attorneys, and a jury being called, they went to trial, which resulted in the verdict and judgment already mentioned.

Upon this statement the enquiry naturally arises as to the mode in which the State Court became possessed of the papers and proceedings appertaining to a cause which had originated in a Court of another power, and of the right of the State Court after obtaining such possession to carry on and complete, without new process and pleadings, a judicial controversy left incomplete by the Territorial or United States Court when it passed out of existence.

The fact is incontestible that the Superior Court of the Territory, though not a constitutional but a legislative Court, according to the distinction made by the Supreme Court of the United States, in the case of the American Insurance Company vs. Canter, (1 Peters' R. 546,) was a Court of the United States, since it derived its existence from the legislation of the United States, acting under the powers conferred by the Constitution.

The Circuit Court being a State Court, had no right as such to succeed to the records and jurisdiction of the Superior Courts, although the State Courts were held in the same places, and were found to be in possession of the records and exercised in fact jurisdiction, though somewhat restricted, over the same matters.

One Court was not the successor of the other in any sense not provided for by competent legislation, and the possession of the papers without the sanction of such legislation was wholly impotent to carry with it into a distinct tribunal jurisdiction over the various controversies of which those papers were only the records.

Another consequence may be deduced from the fact that

these two Courts derived their existence and their powers from distinct sources, and that is, that the legislation which we have said is necessary to create any relation between the Courts, must have the sanction, express or implied, of both the sovereignties to which they belonged, before such legislation can be binding upon the Courts, either as to their officers or as to the suitors.

As no legislation of the Congress of the United States could interfere with the records and limited jurisdiction of the State Courts, (except in certain cases where the States have antecedently ceded the right,) without the acquiescence of the State, so can no State legislation, without the acquiescence of Congress, make the records of a Territorial or United States Court the records of the State Courts, or authorize any proceedings on them.

These propositions as thus stated, seem to require no argument, and were clearly recognized by this Court at its last session, in the case of Innerarity vs. Curtis & Griswold.

The case before us was commenced in the Territorial Court in 1842, and was continued from term to term until the last session of that Court, February, 1845; and in the Fall of that year, we find it, without new process, on the docket of the State Court at its first session, and it was considered and continued by that Court from term to term until final trial. As we have alleged in the general propositions already stated, that the validity of this transfer of the cause from one Court to another depends upon the concurring legislation of the State and Congress, we are brought to an enquiry into the character and extent of such legislation.

The Constitution of the State of Florida gives to the Circuit Courts the most extensive jurisdiction. The sixth Section of the fifth Article provides that "The Circuit

" Courts shall have original jurisdiction in all matters, " civil or criminal, within this State, not otherwise ex- " cepted in this Constitution."

The subject matter of the suit between Bennett and Carter is no where excepted in the Constitution, and was therefore legitimately before the Circuit Court for Franklin County, if properly brought there.

The act of July 22, 1845, in section 5th, enacts that " all " causes, civil and criminal, pending in the Superior Courts, " and all common law cases pending in the County Courts, " shall be transferred to the Circuit Courts, to be held in " the several Counties in which such cases may be so pend- " ing as aforesaid, *together with all the papers* connected " therewith or relating thereto, and the said causes shall be " proceeded in without delay in said Circuit Courts."

The same act, in its 8th section, makes substantially the same provision for the transfer of papers and the jurisdiction of causes pending in the Superior Courts, with the following exception : " Except all cases cognizable by the " Federal Courts which may be organized in this State, " which cases shall be transferred to said Court."

These provisions of the Constitution and the Laws seem ample to give to the Circuit Court (so far as the State is competent to give it) jurisdiction over the cause before us, and a right to the possession of the papers connected therewith or relating thereto, unless it comes within the exception just recited.

If it was a case cognizable by the Federal Courts which might be organized in the State, it would seem by the terms of the 8th section of the act referred to, to be excepted from the operation of this provision for transferring, even though the jurisdiction of the two Courts might be concurrent.

It could scarcely have been within the contemplation of

the Legislature to give to the exception this extensive im-port; but as the purpose of the law was a transfer of cases from a distinct and independent tribunal, and there was no inherent virtue in the State Court considered in its relation to the Territorial Court to draw. to it, from the latter, its jurisdiction. independently of legislative enactment, we feel constrained to interpret the extent of this exception according to the plain and literal meaning of its terms, and if this case was cognizable by the Federal Courts, to sustain the error here assigned.

Was it then cognizable by the Federal Court? Could the Federal Court, which was organized in this State, have taken cognizance of .it? Let us see.

All the Courts of the United States derive their authority from express grant, and "can exercise jurisdiction in "those cases only where it is conferred upon them by act "of Congress." 1 Wash. C. C. R. 231.

The acts of Congress conferring authority upon the Federal Court organized in Florida (so far as they relate to the subject of our present enquiry,) are the general judiciary act of 1789, and the act of February 22, 1847, which has more direct reference to the Court in this State..

The former act, after providing for the jurisdiction of the Circuit Court in certain cases, in its 12th section provides, "That if a suit be *commenced* in any State Court against "an alien, or by a citizen of the State in which the suit is "brought against the citizen of another State, the matter "in dispute exceeding five hundred dollars, and the de-"fendant shall, at the time of entering his appearance in "such State Court, file his petition for the removal of the "cause for trial into the next Circuit Court, on giving bail, "&c., the cause shall then proceed as if brought by origi-"nal process."

This provision of the act is the only one under which it

is claimed that the case before us was cognizable by the Federal Court, and the claim rests upon the alledged fact that Carter was a citizen of the State of Georgia. This fact no where appears during the progress of the trial, either in the pleadings or the evidence; but after verdict, upon a motion in arrest of judgment, the defendant offered to prove that, at the commencement of the action, and at all times since, he was a citizen and resident of the State of Georgia, and the fact was admitted by counsel for plaintiff.

The Federal Court deriving its authority solely from express grant, Carter must bring his right to be sued in that Court, within the provisions of such grant: the Court cannot take jurisdiction by mere analogy.

This suit was not commenced in a State Court, nor did the defendant at the appearance term, nor at any term, file his petition for the removal of the cause. Where, then, is the authority of the Court to take cognizance? The judiciary act gives no authority for the removal of a cause commenced in a Territorial Court, and especially where no motion is made until after verdict; and the authority not being given, it must be denied under the decision already quoted from the Circuit Court Reports, that the Courts of the United States " can exercise jurisdiction in " those cases only where it is conferred upon them by act " of Congress."

It is no sufficient answer to this position to say that, from the peculiar circumstances attending the changes which occurred in the year 1845 in the judicial system in Florida, the defendant was never in a situation to avail himself of the privileges secured by the judiciary act to a non-resident defendant, according to the literal provisions of the act, and that he ought not to suffer from this involuntary disability.

It may be a hardship, but the Court cannot make law;

and we have seen that the United States Court cannot take jurisdiction, however meritorious the claim, without express grant. The very statement of the hardship negatives the right.

The laws of Florida, with unwonted and perhaps unguarded liberality, surrendered to the Federal Courts all the pending cases where there was concurrent jurisdiction, wherever the latter could or would take cognizance, but the judiciary act of 1789 does not bring this case within its cognizance.

Let us now enquire if the act of Congress of February 22, 1847, passed in more direct reference to the Court of Florida, supplies the omission.

The object of this act was to place under the control and jurisdiction of the District Court organized in Florida, certain records and proceedings in the old Territorial Courts.

The act is too long to be here recited, but a careful examination of it will show that it makes no provision for the transfer of the case in question. There are several classes of cases enumerated in the act, and transferred to the District Court, and we will briefly describe them.

1st. Pending suits in relation to private land claims under certain acts of Congress.

2d. Causes pending in the Court of Appeals on the 3d of March, 1845.

3d. Causes determined prior to that period, on which writs of error could have been sued out or appeals taken to the Supreme Court under existing laws.

4th. Causes determined wherein writs of error had been sued out or appeals taken.

5th. All cases pending in any of the Superior Courts of Florida or in the Court of Appeals on the 3d March, 1845, and not legally transferred to the State Courts of the State of Florida, and which said Territorial Courts continued to

hold cognizance of, and proceeded to determine after that day, or which are claimed to have been since pending therein as Courts of the United States.

6th. All cases of Federal character and jurisdiction commenced in said Territorial Courts after said day, &c.

The case of Bennett *vs.* Carter was not founded upon any private land claim, and is not therefore embraced in the first class.

It was not pending in the Court of Appeals, and is not therefore embraced in the second class.

It had not been determined prior to the 3d March, 1845, and is not therefore embraced in the third or fourth class.

The Territorial Courts did not continue to hold cognizance of it, and proceed to determine it after that day; neither was it claimed at the date of the passage of the act to have been pending in the Territorial Courts as Courts of the United States, and it is not therefore embraced in the fifth class.

The case was not commenced after the 3d of March, 1845, and is not therefore embraced in the sixth class.

It thus appears that this case is no where made cognizable by the Federal Court, and not being cognizable by that Court, it does not fall within the exception of the Florida law, so that, so far as the Legislature of the State of Florida could accomplish its transfer to the State Courts, the provision for its transfer is abundantly adequate.

We have yet to show the concurrent assent of Congress to this transfer, but before proceeding to do so, we will advert for a moment to the nature of Carter's claim to any relaxation in his favor of the strict construction we have felt ourselves constrained to give to the legislative delegation of jurisdiction to the Court.

During the interval between the Spring and Fall Terms in 1845, the case is transferred from the Territorial to the

State Court. At the Fall Term it is continued without any objection on the part of defendant to the jurisdiction of the Court. At the ensuing Spring term it is again continued, without any objection on his part. At the next term he appears and argues a motion made in reference to the testimony. And thus he continues to appear from term to term till three years from his first appearance in the State Court had elapsed. At the end of that time he goes to trial, and after a verdict has been rendered against him, we hear for the first time his objections to the Court, or even that he was a citizen of another State.

If he had any privilege at all, it was purely personal. There is no pretence that the subject matter was not cognizable by the State Court; and a privilege purely personal may be waived, and if it had ever existed was in this instance waived by repeated acquiescence in the jurisdiction assumed.

But to return to the argument :—We have shown that so far as State legislation was competent to give it, the Circuit Court had full authority to hear and determine this case. Had it the sanction of Congress, which we have admitted was necessary to the legal transfer of the records and proceedings therein?

The act of Congress of February 22d, 1847, was designed to transfer to the United States District Court organized in Florida all such records of the late Territorial Courts as belonged appropriately to that Court. A careful specific enumeration was made of all the classes of cases so to be transferred as we have already mentioned. It was made the duty of the District Judge to take the necessary steps to get possession of these specified records from the Clerks of the old Courts, or other officers or persons having them in their possession, these expressions, other officers

7

or persons, pointing obviously to the Clerks of the State Courts, who had in fact succeeded to the custody of the papers. This precise enumeration of cases to be transferred from the State Courts leads irresistibly to the inference that Congress acquiesced in the retention by the State Courts of all the other cases and the papers belonging to them. The act of the Legislature providing for the transfer of all these cases not thus enumerated had been passed more than a year and a half, and the State Courts, under the authority of that law, had possessed themselves of them, and had been adjudicating them for nearly the same period. It is impossible to avoid the conclusion that this act of the Legislature and the action of the Courts under it received the sanction of Congress in the act of 1847, so far as they were not in conflict with that act.

Besides this, Florida had followed many an elder sister into the Union, and the same provisions had been repeatedly made for the transfer of Federal causes to the District Courts, accompanied by long acquiescence in the assumption by the Courts of the new States of jurisdiction over causes not federal.

The clearness and force of this inferential sanction of Congress is fully recognized both by the Supreme Court of the United States and by the Supreme Court of this State.

In the case of Benner vs. Porter, 9 Howard R., 235, the Supreme Court say :—" The acts of Congress that have " been passed in various instances on the admission of a " State, providing for the transfer of federal causes to the " District Courts, as in the case of the admission of Flori- " da, already referred to, and saying nothing at the time " in respect to those belonging to State authority, *may* " *very well imply an assent to the transfer of them to the* " *appropriate tribunal.*

" Even the omission on the part of Congress to interfere
" at all in the matter may be subject to a like implication,
" and a subsequent assent would doubtless operate upon
" past acts of transfer by the State authority."

Our own Supreme Court, in the case of Inerarity vs.
Curtis & Griswold, (4 Fla. R., 175,) say :—" Where, as in
" the case of Florida, the act of 22d February, 1847, pro-
" vides for the transfer of the records and proceedings of
" certain classes of cases, saying nothing about other class-
" es, of which the State Courts could take jurisdiction, the
" inference is irresistible that Congress intended that the
" State authorities should assume jurisdiction over the lat-
" ter, or if they had already assumed it, the omission may
" well be considered as a tacit acquiescence in and a ratifi-
" cation of the authority thus claimed and exercised."
" So far as Congress, by the act of February 22, 1847,
" claimed to exercise jurisdiction over certain classes of
" records and pending causes, it is in our opinion the ex-
" ercise of a rightful power, and so far as Congress has not
" claimed those records, it may be considered as the sanc-
" tion of the General Government to the ᐧexercise of the
" jurisdiction by the State authorities over the subject."

We have thus shown that the transfer of the case of
Bennett vs. Carter from the Territorial to the Circuit Court
in which it was tried was made by the Florida Legislature,
with the concurrence and sanction of Congress, and the co-
operation of these two authorities was sufficient to give le-
gality to the transfer, and jurisdiction to the Circuit Court.

We conclude, therefore, that the first and second errors
are not well assigned.

III. The third error assigned is, that the Court ruled out
the notes offered in evidence by defendant.

The defendant was endeavoring to show a title to the
negroes under a mortgage executed by one Warren Jordan

in favor of the Georgia Railroad and Banking Company, and after having given the mortgage in evidence, he tendered certain notes, which were ruled out by the Court, upon the ground that they did not appear to be the debt of the mortgage.

It is the duty of the Court to decide upon the relevancy of a particular fact when offered in evidence. The Court, in endeavoring to ascertain this, will not always confine its notice to other facts already proven, which, in connection with the fact proposed, will render the latter pertinent to the issue; but it has a right and ought to require the assertion at least of counsel that it will be shown, by evidence yet to be offered, to be material.

Such is the approved practice of the Courts, (4 Starkie's Ev., 381,) and without such statement it is no error to reject an isolated fact apparently immaterial, though it may afterwards appear not to be so.

"If the evidence be irrelevant at the time it is offered, "it is not error to reject it because other evidence may af- "terwards be given in connection with which it would be- "come relevant.

"If it would be relevant in conjunction with other facts, "it should be proposed in connection with those facts, and "an offer to follow the evidence proposed with proofs of "those facts at a proper time."—2. Phil. Ev. 428, referring to 11 S. and R., 134.

"A deed to the lessor of the plaintiff may be rejected as irrelevant unless title first be shown in the grantor, or at least an offer made to follow it up with proof of his title." 4 Litt., 272.

In an action on a covenant to save from all judgments in favor of P. & B. against the owners of the steamboat H., recovered for the price of the boat, a record of a judgment on notes against the covenantee in favor of P. & B., was

held not relevant thus nakedly presented. It should have been accompanied with proof *aliunde* that the notes were given for the price of the boat by the owners. Wilson's admr. vs. Bowen, 5 Monroe, 33.

Though a matter may possibly be relevant, yet the party must show how, otherwise it cannot be received. 2 Philipps on Evidence, 434.

It is evident from these authorities that if the evidence before the Court at the time the notes were offered did not, in connection with the notes themselves and statement of counsel, show them to be relevant to the issue, they were rightly ruled out, whatever evidence might be subsequently offered.

How then did the case stand when the notes were offered, as developed on the record before us?

The defendant produced an indenture of mortgage from Warren Jordan of certain property in favor of the Georgia Railroad and Banking Company, to secure the payment of his note for $22,500, dated July 1st, 1839, payable six months after date, and endorsed by Reuben Thornton, and of all other notes that might be given in renewal thereof, or of each other, with interest and costs.

The original debt had been $25,000, and it was recited in the mortgage that the note given for that amount was to be renewed every six months from the first of January, 1839, with a reduction of ten per cent. at each renewal, or twenty per cent. annually, as the Bank might require.

The notes offered were one for $15,000, payable six months after July 1st, 1841, to the order of Reuben Thornton, at the Bank, and another of same date for $627.

There was no proof that these notes were the notes secured in the mortgage, and though it was alleged that they were the representatives of the debt, of which the mortgage was only an incident, it was not proper to supply the

lack of proof by conjecture. Many things would have had to be proved to connect them with the mortgage, and the lack of antecedent and accompanying proof of these things was not supplied by any statement of counsel that the identifying evidence would be forthcoming.

But even had it appeared that the notes were those intended to be secured by the mortgage, there was no proof offered to establish the fact that Carter was the owner of them. An assignment of the mortgage is not an assignment of the debt, (as we will have accasion to show hereafter,) and even if the assignment of the mortgage to Carter had been shown before the notes were offered, which it was not, such assignment would not have carried the notes with it. It is true that the notes tendered had the name of Thornton on them as endorser, but it was not proven that Thornton had endorsed them, and without such proof Carter's title was defective, and the notes were properly ruled out.

Though he was the holder of the notes, the proof of Thornton's endorsement was necessary to give him title. Two things were essential to make the notes relevant as testimony, to wit : That they were the notes secured by the mortgage, and also that they were the property of Carter. The failure of proof on either of these points would have justified the Court in ruling them out, much more the absence of proof on both points.

For these reasons, we think the third error not well assigned.

IV, V and VI. The fourth, fifth and sixth points assigned for error was the admitting the deposition of Johnson, Brown, Griffin and Collier, witnesses for plaintiff. The object of the testimony was to prove the value of certain lands embraced in Jordan's mortgage to the Bank, and which had been sold to satisfy an execution in favor of

Carter. It is stated in the record that when this testimony was offered in three separate depositions they were objected to severally by the defendant, without stating any grounds of objection.

This practice is strongly reprobated by the Supreme Court of the United States in the case of Camden vs. Doremus and others, 3 Howard, 515. In delivering their opinion in that case the Court say :—" After each deposition " offered in evidence by the plaintiffs to the jury, it is sta- " ted that to the reading of such deposition the defendant, by " his counsel objected, and that his objection was over- " ruled.

" With regard to the manner and the import of this ob- " jection, we would remark that they were of a kind that " should not have been tolerated in the Court below, pen- " ding the trial of the issue before the jury. Upon the of- " fer of testimony, oral or written, extended and compli- " cated as it may often prove, it could not be expected, " upon the mere suggestion of an exception, which did not " obviously cover the competency of the evidence, or point " to some definite and specific defect in its character, that " the Court should explore the entire mass for the ascer- " tainment of defects which the objector himself either " would not or could not point to their view. It would be " more extraordinary still if under the mask of such an ob- " jection, or mere hint at objection, a party should be per- " mitted in an appellate Court to spring upon his adversa- " ry, defects which it did not appear he ever relied on, " and which if they had been openly and specifically al- " leged might have been easily cured. 'Tis impossible " this Court can determine or do more than conjecture, as " the objection is stated in this record, whether it applied " to form or substance, or how far, in the view of it pre- " sented to the Court below, if any particular view was so

" presented, the Court may have been warranted in over-
" ruling it.

" We must consider objections of this character as vague
" and nugatory, and, if entitled to weight anywhere, as
" without weight before an appellate Court."

The Supreme Court of New York is in perfect agree-
ment with the Supreme Court of the United States upon
this point. " A party," says Mr. Justice Paige, " who
" objects to evidence or the competency of witnesses,
" should state specifically the grounds of his objections.
" It is not sufficient to object generally that the evidence
" is illegal, or the witness is incompetent ; but the party
" objecting must put his finger upon the very point, to
" apprise the Court and his adversary of the precise objec-
" jection he intends to make." Elwood vs. Deifendorf, 5
Barbour's S. C. Reports, 406, citing 3. Howard, 515, 1
Cowen, 622, 12 Wendall, 504, 1 ib. 418, 1 Hill, 91.

The character of the objection and the mode of making
it, in the case before us are precisely the same as those
condemned by these two eminent Courts. But there is still
another circumstance appearing upon the record which
shows still more that (to use the language of the Supreme
Court,) " they should not have been tolerated in the Court
below." Two of the depositions were regularly crossed by
defendant, and his cross interrogatories have direct refer-
ence to the main points sought to be proved, and in the
third he objects only to certain of the interrogatories on
grounds not relating to the relevancy of the evidence, and
at the trial he makes his objection general, as in the other
cases. By permitting the interrogatories to be put with-
out objection as to the relevancy of the testimony, we con-
sider him to have added much force to the condemnation
pronounced by the two Courts we have cited in regard to
the vague and nugatory objection made at the trial.

For these reasons chiefly, we think these errors not well assigned, though we may add, that the evidence, even if irrelevant, could not have possibly misled the jury. It is a well settled rule that the admission of immaterial testimony cannot be assigned for error by a party, where no injury could have possibly resulted to him from its introduction. As the position will apply to several of the remaining points which we have to examine, it may be proper here to sustain it by authority. In the case of Greenleafs, lessee, vs. Birth, 5 Peters, 135, Judge Story, who delivered the opinion of the Court, said : " And we wish it " to be understood as a general rule that where there are " various bills of exceptions filed, according to the local " practice, if in the progress of the cause the matter of any of " the exceptions become wholly immaterial to the merits, " as they are finally made out at the trial, they are no lon- " ger assignable as error, however they may have been " ruled in the Court below. There must be some injury " to the party to make the matter generally assignable as " error."

In 1 Cond. Reports, 263, in the case of Turner vs. Fendall, Judge Marshal, in delivering the opinion of the Court, says : " Although the testimony rejected was proper and " legal evidence towards establishing the fact, yet the Court " committed no error in rejecting the testimony, for which " this judgment ought to be reversed, because the fact does " not appear to have been *relevant* to the cause under con- " sideration."

So in 7 Blackford, 578, in Van Vacter vs. McKillip, it is said, " The admission of immaterial evidence (the " merits of the case having been fully tried,) cannot be as- " signed for error."

The testimony referred to in the assignment under con-

sideration was rebutting testimony, and as Carter by the ruling out of the notes had failed to show any title under the mortgage, its admission could not possibly have prejudiced him, and is not therefore assignable for error.

VII. The admission of certain bonds executed by Bennett on a claim to the negroes when levied on by Carter under his judgment on the mortgage, is assigued for error in the seventh place.

The assignment on the record connects certain affidavits of Bennett with the bonds, and the affidavits do in fact appear on the record, but it is clearly stated that the plaintiff only offered " two bonds," and as clearly that the " two papers " were objected to by defendant.    And the record adds that before reading *said bonds*, plaintiff introduced Joseph Hand—the insertion of the affidavits is therefore a clerical error, caused probably by the affidavits and bonds being written on the same sheet of paper.    The exhibition of the bonds could avail nothing to the injury of Carter, while they were calculated to rebut any presumption of acquiescence by Bennett in Carter's claim, " for admissions " may be implied from the acquiescence of the party." Greenleaf, 197.

· The objection to this ruling of the Court is not sustained.

· VIII. The eighth matter assigned for error is that the Court excluded defendant's testimony of the clearance of the slaves at the Custom House for New Orleans, and a certificate appended thereto.

It is impossible for us to perceive the relevancy of this testimony.  If Bennett's right to the possession of the slaves was better than Carter's, he had a right to clear them—if it was not better, his clearing them did not make it worse.

The error is not well assigned.

IX. It is ninthly assigned that the Court erred in refu-

sing to instruct the jury generally upon the points of law arising in the case, when called upon by counsel, and in its construction of the statute of 1848 upon that subject.

The common law principle, as asserted by the defendant's counsel, is undoubtedly true, that it is the duty of the Judge to give the jury his opinion in matters of law arising upon the evidence.

Mr. Justice Blackstone says so in those very words. 3 Com., 375. But even if the act of 1848 made no change in the common law, it would not be error for the Judge to omit doing so, when he expressed his readiness to charge upon any point suggested by counsel.

In the case of Pennock *et al. vs.* Dialogue, the Supreme Court of the United States say : " It is no ground of rever-" sal that the Court below omitted to give directions to the " jury upon any points of law which might arise in the " cause, when it was not requested by either party at the " trial.   It is sufficient for us that the Court has given no " erroneous directions.

" If either party deems any point presented by the evi-" dence to be omitted in the charges, it is competent for " such party to require an opinion of the Court upon that " point.   If he does not, it is a waiver of it.   The Court " cannot be presumed to do more in ordinary cases, than " to express its opinion upon the question which the par-" ties themselves have raised at the trial."   2 Peters, 15.

If the Court omits to charge at all, the remedy of the party, who may deem himself prejudiced by such omission, is, in the first instance, to apply to the Judge, and ask such instruction as he desires.   If the Judge refuse, he may then come to an Appellate Court for redress : he cannot come directly to this Court without first seeking what he desires from the Court below.   If the omission to charge is a wrong at all, it is a wrong alike to both parties and to

the jury, and either party to make it a wrong against him-self, of which he may complain, must point out to the Judge what he wants, and be refused.

Such we understand to be the meaning of the Supreme Court in the opinion from which we have quoted. The re-quirement of the statute of 1848, that the charge shall be in writing, makes it, in many cases, physically impossible for the Judge to charge upon every point of law, and ac-cording to the reasoning of defendant's counsel, the omis-sion of one point would be error as well as the omission of all. The object of the statute seems to have been to re-strain the Judge from intermeddling with the facts.

The word "only," in the first section, qualifies the duty of charging—no new duty is imposed. At most, it is left as it was at common law, though the precise description of the mode of charging in the other section seems, in some degree, to warrant the construction of his Honor, but upon that point we need give no opinion, as we think that, even at common law, there was no error in his ruling.

X, XI. It is assigned in the tenth and eleventh pla-ces that the Court erred in refusing the first special in-struction asked, and in giving a modified instruction in lieu thereof.

The instruction asked was as follows :

"That a party cannot be permitted to gainsay or deny his own solemn oath of record made in this Court, setting up the facts sworn to as a defence in the action, and when such oath is introduced to the jury it is conclusive against such party making such oath, and the highest possible ev-idence;" which the Court gave in substance, with this qualification: "But he may be permitted to explain it, and to show that it was made in ignorance of his rights, or under a misapprehension in regard to them."

In the case of Heane vs. Rogers, 9 B. & C., 577, (re-

ferred to and quoted in Greenleaf Ev.; see 204, *note*,) Mr. Justice Bayly, in delivering the judgment of the Court, says :—" There is no doubt but that the express admissions of a party to the suit, or admission implied from his conduct, are evidence and strong evidence against him, but we think he is at liberty to prove that such admissions were mistaken or untrue, and is not estopped or concluded by them, unless another person has been induced by them to alter his condition. In such a case the party is estopped from disputing their truth with respect to that person, (and those claiming under him,) and that transaction, but as to third parties he is not bound. It is a well established rule of law that estoppels bind parties and privies, not strangers." See also numerous authorities referred to by Mr. Greenleaf. In the text of the same authority (Greenleaf, 210,) it is said :—" The mere fact that an admission was made under oath, does not seem alone to render it conclusive against the party, but it adds vastly to the weight of testimony, throwing upon him the burden of showing it was a case of clear and innocent mistake."

In Thomas vs. White, 1 Tyrw. and Grang. 110, cited in a note to the same section, " the party had sworn positively to matters of fact in his own knowledge, but it was held not conclusive in law against him, though deserving of much weight with the jury." The charge of the Judge appears to be in perfect accordance with these well established principles.

12th assignment. The facts upon which the twelfth assignment is based are as follows : The plaintiff in the Court below had filed an affidavit in another cause, setting forth that the slaves sued for had been removed from the State of Georgia by Warren Jordan and Reuben Thornton, with intent to defraud the Georgia Railroad and Banking Company, and others, contrary to the laws of that State;

and further, that Jordan had brought the negroes into Florida in violation of a statute of the Territory.

Defendant asked the Court to instruct the jury that a party cannot claim title to property in any Court of this State, when such claim comes through such facts as were sworn to in the affidavit just mentioned. The Court refused the instruction because " the law was so mixed with the facts in the instruction asked, that one could not be given without the other."

The proposition here asserted by the defendant cannot be maintained upon authority.

A voluntary or fraudulent conveyance is perfectly good between the parties and their representatives, and against all persons except creditors. Am. L. Cases, 59, citing 5 Binney, 109, and numerous authorities.

The estate becomes at once subject to the debts of the grantee, (2 Halst. R., 173,) and a voluntary conveyance by the fraudulent grantee to the original grantor will be fraudulent against the creditor of the former, (10 Conn., 39.) Again, the creditor of the fraudulent grantor has no title to the property conveyed to the grantee ;—he has a right only to have his debt paid out of the property by a sale under judgment or decree. If he seeks to set aside a conveyance upon the ground of its being fraudulent as to creditors, he must prove himself to be a judgment creditor. In Angel vs. Draper, 1 Vernon, 399, and Shirly vs. Watts, (3 Atk., 254,) cited by Chief Justice Kent in the case of Wiggins vs. Armstrong, 2 John C. R., 144, it was held that the creditor must have completed his title at law by judgment and execution before he can question the disposition of the debtor's property. The same doctrine is declared in Balch vs. Westall, 1 P. Williams, 445.

In the case in 2 J. the Chancellor says : " The reason of the rule seems to be that until the creditor has established

his title he has no right to interfere, and it would lead to an unnecessary and perhaps a fruitless and oppressive interruption of the exercise of the debtor's rights. Unless he has a certain claim upon the property of the debtor, he has no concern with his frauds."

Was Carter, then, a judgment creditor of Jordan, and as such entitled to interfere with the disposal of his property? This depends upon the validity of the proceedings in the suit for foreclosure. The record shows that Carter obtained a judgment at the Fall term against Jordan, but the validity of that judgment it was competent for Bennett to contest. Chief Justice Ruffin, in the case of Hafner *vs.* Irwin (4 Iredell, 529,) sustaining the view of Chancellor Kent, already quoted, as to the necessity of a judgment, yet adds a qualification in very significant language : " A creditor must establish his debt by judgment before he can raise the question of the validity of a conveyance made by his debtor. As a general creditor by contract, he has no right to the property nor lien for the immediate satisfaction of his debt. He must therefore proceed to judgment. The judgment is not conclusive against the party claiming under the deed, *for judgments may be fraudulent as well as deeds.* It is, therefore, open to the grantee in the deed to show that the recovery was by covin or collusion."

Bennett having the right to impeach this judgment, the inquiring into its validity was a question of fact for the jury. It was only in the event of the judgment being valid that the facts admitted by Bennett in the affidavit were material or conclusive against him, and therefore the Judge might well say, " that the law was so mixed with the fact in the instruction asked, that one could not be given without the other." To us who have the record before us, the propriety of the refusal of the instruction is manifest, from a consideration of the facts into which his Honor below

declined to look. The judgment of foreclosure was clear-ly erroneous. There was no notice to Jordan, personally or by publication of the amended petition of Carter, upon which judgment was rendered.

There was no proof of the execution of the mortgage, and none of the debt, except by the admission of Thornton as agent, by a power of attorney clearly insufficient to give him such authority.

Again, in the foreclosure suit, according to a former decis-ion of this Court in Wilson vs. Hayward, 2 Fla. R., 27, Jordan was not the proper party defendant, for he had parted with his equity of Redemption, and for that reason, in the words of the Court in the case referred to, " the " proper course was to go against the purchaser, as the " proper party to the petition, according to the terms of the " statute itself. The prayer is that the mortgagor and all " persons claiming or to claim by, through or under him, " be foreclosed, and by the 4th section personal service of " notice, &c., shall be served upon the mortgagor, or *other* " *person* having the equity of redemption."

It is thus apparent that the validity of the judgment be-ing impeachable by Bennett, and depending upon many facts, and yet so necessary to Carter to place him in the relation of a judgment creditor to Jordan, in order to au-thorize him in interfering with Bennett's title, though fraudulently acquired, it is apparent, we think, from these considerations, that the Judge was right in refusing the instruction.

But it may be said that Carter was a mortgage creditor, at least, even if the judgment was void, and that under the authority of Philips vs. Hawkins, 1 Fla. R., 262, he be-came absolute owner of the mortgaged property upon the condition of the mortgage being forfeited.

Although the mere statement of this objection shows

Carter *vs.* Bennett.—Opinion of Court.

that the matter was strictly within the province of the jury, and that the Judge was right in his ruling, yet a brief consideration of the facts proven demonstrates that Carter was not a mortgage creditor in that sense which would have authorized him to call in question the title of Bennett, even though derived in the manner stated in the affidavit.

He had given in evidence on the trial an indenture of a mortgage executed by Jordan to the Georgia Bank, which was regularly assigned by the Bank to Carter. It is clear, upon authority, that this alone did not constitute him a creditor by mortgage. In 4 Com., 194, Chancellor Kent says : " The assignment of the interest of the mortgage in the land without an assignment of the debt is considered to be without meaning or use. This is the general language of Courts of law as well as equity."

" The mortgage interest, as distinct from the debt, is not a fit subject for assignment. It has no determinate value. If it should be assigned, the control over the mortgage premises must essentially reside in him who holds the debt." 4 J. R., 43.

" A mortgage is a mere incident of the debt, and assignment of the interest in the land without the debt is a nullity." 2 Cowen, 195.

So in 2 Cowen, 231, it is said, referring to 19 J. R., 325, that the mortgage is a mere incident to the bond, as personal security for the debt, and that an assignment of the interest of the mortgage without an assignment of the debt is considered in law as a nullity.

See upon this point 7 Penn. R., 280, 17 Serg. & Rawles, 400, 5 Cowen, 202, 6 N. Hamp., 205, 11 N. Hamp., 274.

In the 2d Vol. of Leading Cases in Equity, 445, it is said : " It is a further consequence of the general subordination of the estate in the land to the purposes of the debt,

9

that an assignment of the latter will draw the former with it, (citing the first three cases above referred to,) but that the estate in the land cannot be assigned apart from the debt," citing the other authorities above.

The proofs upon the record show that Carter was the holder and assignee of the mortgage by regular assignment, but this alone, according to some authorities, was a transfer of a naked trust, and according to others, a mere nullity.

There is no evidence that he had an interest in the debt. It is true that at one stage of the trial, he offered certain notes which were ruled out, because they did not appear to be the debt secured by the mortgage. This ruling, for the reasons already adduced in our consideration of the third error, we deem to have been correct, and Carter stood before the Court and jury as the assignee of the mortgage, without an interest in the debt. This was not sufficient to make him a mortgage creditor, or a creditor in any sense of Jordan, and therefore he had no right to complain of the facts set out in the affidavit, nor to defend himself even against the bare possession of Bennett. But the affidavit of Bennett states that the negroes were brought into the State of Florida in violation of the statute prohibiting the importation of slaves, under certain circumstances.

And this is relied on as a ground on which Carter justifies the taking and seizing the negroes out of Bennett's possession, without authority of law, and claiming them as his own.

The authorities cited by Carter's counsel go to prove what may be readily conceded, namely, that a contract made in violation of a statute imposing a penalty, but without declaring the contract void, is nevertheless void.

It is not easy to perceive how this principle of law can be invoked by Carter in this case. Bennett had possession of the negroes, and insisted that such possession gave

him good title against all except the rightful owner. Carter could not by proving his (Bennett's) admissions, or by any other evidence, that the negroes had been imported contrary to the statute, justify the taking them from Bennett's possession, without authority of law. Bennett's violation of law did not confer any title upon Carter. Carter having failed to prove himself the rightful owner, Bennett's title, founded upon possession, must prevail.

The instruction, therefore, was properly refused, both because the naked legal proposition asserted is wrong, and also according to the ruling of the Judge certain facts would have to be proved before Carter could be placed in such relation to Jordan as to have any concern with his frauds.

XIII. It is assigned in the thirteenth place for error that the third instruction asked was qualified by the Judge below. The third instruction asked was in these words: "That no man can claim title to property sworn by himself "to have been acquired by a direct violation of the statute "of frauds, as against the parties intended to be defraud- "ed;" which the Court altered by adding thereto the words, "unless he shows that he made such oath under a "misapprehension as to the law, or the facts, or the evil;" which instruction, so altered, he gave.

For reasons already given, and supported by ample authority, it is evident that the instruction asked could not have been properly given. A creditor must establish his debt by judgment before he can raise the question of the validity of a conveyance made by his debtor. This is the concurrent import of numerous authorities we have heretofore cited, and is too well settled to admit of question.

Even if the instruction asked was not obnoxious to this objection, the qualification of the Judge was altogether

proper, for the reasons we have adduced under the tenth and eleventh branches of the assignment.

XIV. It is alleged in the fourteenth place that the Court erred in adding the qualification ("or other consideration") to defendant's fifth instruction, there being no evidence to authorize it, and the bills of sale purporting to be for money. The instruction asked was as follows : "That a vol-" untary bill of sale in which no money is paid, carries no "title against prior creditors, especially mortgage credit-" ors, and even if another person should buy for money, with " notice of the person holding under such bill of sale, such " new party can claim no title against such prior creditors " or mortgagees." This instruction was given after insert-ing the words, "or other valuable consideration given," after the words "no money is paid."

This qualification seems to us to be very harmless. We have shown that prior creditors simply, not being judgment creditors, cannot impeach a voluntary conveyance, and as to mortgage creditors, we cannot perceive how the qualifi-cation impairs the force of the instruction as asked for. And besides, we may remark here, what applies to many of these numerous exceptions, that the frequent allusions to Carter as a mortgage creditor are not warranted by the law of the facts proved. The ruling of the Court on the twelfth error assigned, with the reasons and authority there pre-sented, establish that the assignee of a mortgage simply is no mortgage creditor.

There was an entire absence of testimony before the jury to prove that Carter was the assignee of the mortgage debt, and not being such, he was in no sense a creditor of Jordan. The matter of this instruction, therefore, had no reference to him, and it might have been properly refused altogether.

XV. It is alleged in the fifteenth place for error that the

Court refused the defendant's ninth instruction, which is in these words : "That the title to the sixteen negroes "mentioned in the action of trover in Georgia was de-"cided in that case to be in Farish Carter, and the jury "cannot reverse or review that decision, and must throw "that number of negroes from their consideration." The Court refused this, "because involving facts upon which "the Court is prohibited from instructing the jury."

The exemplification of a record of another State is evidence of a very high order, but still it is evidence for the jury, involving facts, and in the case before us the identity of the negroes mentioned in this record with the negroes sued for by Bennett, was a very material fact, and necessary to be proved in order to give any value to the record as testimony for the defendant. Well, therefore, might the Judge hesitate to tell the jury that they must throw sixteen negroes from their consideration. He left that properly and appropriately for them to decide. upon the facts before them. But however erroneous this refusal might have been, why should the defendant complain, since, at an antecedent stage of the trial, and before the case was argued to the jury, the plaintiff's counsel, as it is stated in the record, "abandoned his suit to the negroes in the declara-"tion mentioned, proved to have been re-captured by "Bennett from Long's plantation—same being included in "the Columbus judgment, Carter vs. Bennett."

It seems to be at least a waste of the time both of the Court below and of this Court, to have asked for the instruction there, and to have assigned the refusal for error here, under the circumstances we have just mentioned.

XVI. It is said in the sixteenth place that the Court erred in refusing the thirteenth instruction asked by defendant. The instruction asked for was as follows : "That "the record in the case of Peninah W. Thomas vs. Farish

" Carter, being in evidence before the jury, and comment-
" ed on by plaintiff, is conclusive as to any subject matter
" decreed upon in said record, and if the record shows that
" a foreclosure has been had in Georgia on the personal
" property by said mortgage conveyed, on the fifth of Ju-
" ly, 1842, the title to the personal property became abso-
" lute in the mortgagee—an action of trover for said per-
" sonal property subsequently commenced by the mortga-
" gor, or any person claiming by, through, or under him,
" cannot be maintained." It was refused by the Court
because it was not conclusive against any but those who
were parties or privies to the record.

This exception seems to have been abandoned by defend-
ant's counsel. It is certainly untenable. Mr. Greenleaf
tells us, " it is a most obvious principle of justice that no
" man ought to be bound by proceedings to which he was
" a stranger." Greenleaf on Ev., 522.

And persons who have no right to make defence, or to
control the proceedings, and to appeal from the judgment
—to adduce testimony and to cross-examine the witnesses
adduced on the other side, are regarded as strangers to
the cause. Ibid, 523.

XVII. It is assigned as the 17th error that the Court re-
fused the 14th instruction asked for without qualification.
The instruction asked was that " a party whose title is
" tainted with fraud, cannot rely upon such title to object
" to the regularity of a decree rendered in favor of the
" creditor against the debtor, who did so fraudulently part
" with his title, and this will apply in the case of a fore-
" closure of mortgage by mortgagee against mortgagor,
" where the decree is attacked by any one claiming title
" under a mortgagor who has fraudulently conveyed his
" equity of redemption to hinder and delay the mortga-
" gee;" which the Court refused, but gave with this quali-

fication : " Such person being cognizant of the fraud at the time of his purchase."

We have already said, upon the authority of Chief Justice Ruffin, that judgments may be fraudulent as well as deeds, and that they are open to the grantee in a fraudulent deed to show fraud or irregularity if he can. And " it is a general rule that a decree in Equity shall not, any " more than a verdict or judgment at law, either conclude " or in any way prejudice the rights of those who are not " parties to the suit." 20 Wendall, 262.

The Judge, by his qualification, confines this privilege to persons not cognizant of the fraud at the time of their purchase, and if the positions cited from the North Carolina and New York Courts be true, the charge of his Honor was more favorable to the defendant than he was entitled to.

The cases referred to by defendant's counsel in the Florida Reports, do not contradict these conclusions. In 2 Florida Rep., 518, it is said : "Fraud will vitiate any, even the " most solemn transactions, and an asserted title to prop- " erty founded upon it is utterly null," and reference is made to 15 Peters and 2 Howard, and the Court adds : " No doubt a record may be affected and even vitiated by " fraud."

All this is in perfect harmony with the conclusions which we have elaborated elsewhere. Counsel do not seem to distinguish between fraud and fraudulent conveyances. The first vitiates all transactions, and the latter are fraudulent and void only as against certain specified parties.

Carter has never brought himself (as we have clearly shown,) among those specified parties, and therefore Bennett's title, however fraudulent it may be to others, is not so as to him.

XVIII. The eighteenth error assigned is that the Court

refused the sixteenth instruction as written, but gave it
with the additional words in brackets below, viz:

"In cases of foreclosure at common law, under our stat-
"ute, any person claiming by, through or under a mortgagor,
"can come in and state his objections, under oath, show-
"ing cause against foreclosure of the mortgage proper;" to
which the Court added, [provided, he is served with legal
notice, either personally or by advertisement.]

His Honor clearly meant, we suppose, by this ruling,
that no party can be affected by a foreclosure under the
statute, unless he is served with legal notice, which is too
obviously true to require comment. But if we mistake
the intention of the Court, and his proposition is meant to
be understood literally, still it was but a qualification,
either with or without which the instruction asked was a
mere abstract proposition, having no reference to the facts
of the case. The most that is asserted is that Bennett
might have come in without notice—it is not alleged that
he was under obligation to do so.

The fact is that he had no notice, and was not therefore
concluded by the judgment, however true or false the prop-
osition may be as laid down by the defendant in his in-
struction.

We think, therefore, the error is not well assigned.

XIX. The nineteenth point assigned for error is that
the Court erred in refusing to give the third clause of de-
fendant's eighteenth instruction.

This clause of the instruction asked is in these words:
"That no such property or possession can be maintained
"against a prior creditor of the vendor, Thornton or Jor-
"dan, unless such property or possession was obtained
"bona fide;" which was refused by the Court because it
was "mixed with fact."

His Honor might have refused the instruction for a still

better reason. The principles we have established, showing the necessity of a creditor obtaining a judgment before he has a right to impeach a conveyance, apply with all their force in resistance to the position here assumed by defendant. Nay, more, a judgment creditor, as such simply, has no title to the debtor's property till it is consummated by the execution of the judgment. It is surely not necessary to quote authority to prove that "in trover posses-"sion, whether rightfully or wrongfully obtained, is a suf-"ficient title in the plaintiff as against a mere stranger." 10 Vt., 208, 11 Vt., 351.

We have, in the progress of this opinion, exhausted argument to show that Carter, so far as the record informs us, was a stranger, and that it was perfectly immaterial to him what was the nature of Bennett's title or possession, if any title or possession at all was proved.

XX. The twentieth error assigned is that the Court erred in refusing defendant's motion for a new trial.

The motion in this case is based upon the allegation that there was error both in the ruling of the Court upon the law and in the finding of the jury upon the facts of the case. So far as the questions of law are concerned, they have been presented to the consideration of this Court in every variety of aspect. The skill and ingenuity of the eminent counsel having charge of the case, seem to have been tasked to the uttermost in exhibiting every possible question in every possible phase, and the Court must take some credit to itself for the patience with which it has pursued the multiform enquiry which has been asked at its hands.

Has the appellant a right to demand of us to pass upon the facts? Have we a right to control the discretion of the Court below in relation to its granting or refusing a a new trial?

The question is not a new one before the appellate tribu-

nals in Florida; for it was presented to the late Court of Appeals, in the case of the United States vs. Jerrison & Foster, (not reported,) and decided adversely to the application. We see no reason to justify us in departing from that decision.

Although we have given to the subject as much thought and research as its importance seems to merit, we feel constrained, by the unusual length to which this opinion has been unavoidably protracted, to allude very briefly to the considerations which have influenced our judgments. The whole frame-work of our judicial structure is derived from our English forefathers, and the practice of reviewing the decisions of a Court, upon motions for a new trial, is wholly unknown to the judicial system of that country. Such also is the case with the Courts of the United States, while the Courts of the several States seem to be about equally divided upon the question. The weight of authority, therefore, is clearly against the exercise of the right of controlling the discretion of the inferior Courts on the subject of new trials.

When we consider the expediency of asserting such a right, we are at once met by the enquiry whether we are as competent to judge of the weight of evidence as the Court and jury before whom it is given? One of the Courts which accord the right to an Appellate Court of reviewing the decisions of inferior Courts on this point, says: " Great deference is due to the judgment of the legitimate "triers of matters of fact." "That Court has opportuni-"ties greatly superior to those enjoyed by this Court, of "determining whether the verdict is against the weight of "testimony." (7 Missouri, 221.)

In this admission, we conceive, rests the whole argument against the expediency of the exercise of this power. Every one at all familiar with the incidents of a jury trial,

must admit the impossibility of conveying to an appellate tribunal a perfect transcript of the evidence given to a jury. The tongue of the witness is not the only organ for conveying testimony to the jury; but yet it is only the *words* of a witness that can be transmitted to the reviewing Court, while the story that is told by the manner, by the tone, and by the eye of the witness, must be lost to all but those to whom it is told. The testimony of one witness, given with calm self-possession, an erect front, and an unhesitating accent, imports verity as strongly as a record, while the confusion, the hesitation, and trembling of another, will contradict to the eye what his faltering tongue has uttered to the ear. Yet the testimony of each will stand alike before the Court of review.

For this reason mainly, and for others which we need not adduce, we deem it our duty to adhere to the practice, sanctioned by the most venerable authorities, of leaving the question of granting or refusing motions for new trials to the Judge who has had the privilege of hearing the evidence.

The points assigned for error, subsequent to the twentieth, were not noticed in the argument, and are understood to have been abandoned by the defendant. But as they are upon the record, it is our duty to pass upon them, which we shall do in the briefest possible terms.

XXI. The twenty-first point denies the jurisdiction of the Court, which question we have disposed of in our consideration of the first and second points.

XXII, XXIII. The twenty-second and twenty-third points deny the right of Judge Douglas, who was the Judge of the Eastern Circuit, to sit in the case, which was tried in the Western Circuit.

The State Constitution provides, in the 7th sec. of the

5th article, "That the Judges of the several Circuit Courts "may hold Courts for each other."

XXIV. The twenty-fourth point seems to have reference to the same point, and the assignment is, therefore, not sustained.

XXV. The twenty-fifth point presents an objection to the verdict, upon the ground of excessive damages. This was a matter proper to be brought to the attention of the Court below on a motion for a new trial. *We* have nothing to do with it.

XXVI. The twenty-sixth point is obnoxious to the same objection.

XXVII, XXVIII. The twenty-seventh and twenty-eighth points are mere recapitulations of others already decided upon.

The true elements of this controversy, when divested of the multitudinous wrappings in which it has been presented to our notice, (the printed record making a well sized octavo volume,) are very few and very simple. Bennett was in possession of the slaves when they were taken from him by Carter, and converted by Carter to his own use. Whether Bennett's possession was rightful or not, Carter had no right to divest him of it *manu forti*, without showing that he was a judgment creditor or a mortgage creditor of Jordan's. He failed to do both, and stands before the Court simply as a stranger, intermeddling without authority with the possession of another.

Having reviewed in detail the many complicated questions presented upon the record of this case, we conclude by saying, we find no such error in the proceedings in the Court below as to require us to set aside the judgment, and we shall accordingly direct the judgment to be affirmed, with *costs*.

Let the judgment be affirmed, with costs, and the case remanded to the Court below.

NOTE BY THE REPORTER.—In the 8th line of the Head Notes, on page 283, instead of "*former*," read latter.