BAR RULES COMMITTEE OF THE STATE OF ARKANSAS
*v.* RICHARDSON.

4-6304                                          150 S. W. 2d 953

Opinion delivered April 21, 1941.

418

*Ernest Neill, A. L. Smith, John P. Woods, A. J. Johnson, O. A. Graves, J. Mitchell Cockrill* and *Chas. D. Frierson,* for appellant.

*W. E. Beloate* and *S. L. Richardson,* for appellee.

McHANEY, J. Appellant, the Bar Rules Committee of the state of Arkansas, filed charges of unprofessional conduct against appellee, a licensed attorney at law of Walnut Ridge, Arkansas, in the office of the clerk of the Lawrence chancery court and sought his disbarment as a member of the bar of this state. The charges consisted of two counts in the form of a complaint. We find it necessary to consider only the first count which is as follows: "Said Roy Richardson, on or about September 5, 1939, and during the term of circuit court at Walnut Ridge, in session about said date, represented E. G. Fooks, plaintiff, in a suit in the Lawrence circuit court for the eastern district, No. 1906, against D. F. Jones Construction Company, Inc., defendant, which suit resulted in a verdict for the plaintiff for personal injuries and an appeal was taken to the Supreme Court of Arkansas, where the cause was reversed on January 29, 1940, *D. F. Jones Construction Co.* v. *Fooks,* 199 Ark. 861, 136 S. W. 2d 487, the appeal being taken and the decision

on appeal rendered in two consolidated causes covering the same alleged injury.

"Also at the same term he represented one Hathcoat in a suit for personal injuries against one Sloan, which also resulted in a verdict and judgment from which an appeal was taken, and by said court decided, *Sloan* v. *Hathcoat*, 199 Ark. 530, 134 S. W. 2d 873, 136 S. W. 2d 1020, being affirmed on condition of remittitur.

"Prior to convening of said court the said Roy Richardson and his agents, Clyde Robbins and others, approached prospective jurors offering inducements to such jurors to attend and act as jurors and not to seek excuse and promising remuneration and favors for verdicts favorable to said Roy Richardson. For further details of such approaches and dealings with jurors, reference is made to the affidavits of Fred A. Isgrig, Harry C. Robinson, C. F. Grigsby, H. C. (Pud) Hutchinson, W. M. Fallis, Dent Brady, and Clyde Robbins, which are contained in the bill of exceptions in the case of *Fooks* v. *D. F. Jones Construction Company, Inc.*, and such affidavits are further referred to in the opinion of Chief Justice GRIFFIN SMITH, McHANEY and BAKER, Justices, concurring."

To this complaint appellee filed a general demurrer and motion to transfer to the circuit court, both of which were overruled at the conclusion of the evidence. Appellee answered with a general denial and a plea of *res judicata* on the grounds, 1, that the matters charged were adjudicated in the motions for new trials in the Fooks and Hathcoat cases; and, 2, had recently been investigated by the prosecuting attorney and grand jury, who refused to indict him.

Trial before Chancellor J. M. Shinn, on exchange of circuits, resulted in a judgment dismissing the complaint for want of sufficient proof to support the charges laid, hence this appeal.

This disbarment proceeding is the aftermath of two personal injury cases tried in the Lawrence circuit court and appealed to this court late in 1939 and early in 1940,

the first being *Sloan* v. *Hathcoat*, 199 Ark. 530, 134 S. W. 2d 873, 136 S. W. 2d 1020, and the second being *D. F. Jones Construction Co., Inc.,* v. *Fooks,* 199 Ark. 861, 136 S. W. 2d 487. A reference to these cases and particularly to the latter, both the original and concurring opinions will be enlightening and will obviate the necessity here of quoting the evidence produced in the trial below *in extenso.* As stated in the brief of the Bar Rules Committee: ''The duty to present charges against lawyers is naturally most unpleasant and the committee approaches such matter with regret. However, in view of situation developed in the case of *D. F. Jones Construction Company, Inc.,* v. *Fooks,* 199 Ark. 861, 136 S. W. 2d 487, it became very plainly the duty of the committee to file charges and in fact such charges were practically demanded by public sentiment of the profession.'' We appreciate the sentiment of the committee thus expressed and were gratified to hear counsel for appellee say in oral argument that the committee had been very kind and considerate of them and their client in the prosecution of the case, and that no rancor or ill feeling exists towards them.

Clyde Robbins, the self-confessed tool of appellee, employed by him to fix jurors at the March, 1939, term of the Lawrence circuit court, testified substantially as he did on the motion for a new trial in the Fooks case, to the effect that appellee was to pay him $5 for every juror he interviewed and $5 more if the verdict was favorable; that he was employed ''To talk to them and see if they were all right.'' To ''see if they were for the Richardsons.'' He was asked and answered as follows: ''Q. What promises did he have you to make them? A. That they would be treated right in some of the cases and in one case he promised two per cent. of the verdict.'' The witness talked to prospective jurors Dent Brady, Pud Hutchinson and Peyton Lately, and Brady and Hutchinson told him they would stand ''hitched.'' This witness was very successfully impeached and the trial court apparently put no credence in his testimony and we cannot say that he should have been believed in view of his bad reputation and his criminal record, although he is corroborated in the fact that he did inter-

view both Brady and Hutchinson in an attempt to "fix" them for appellee by both of them. But he stands alone in saying he was employed to do so by appellee. But conceding that Robbins is not worthy of belief, still we have the testimony of jurors Charley Grigsby and W. F. Fallis to consider. Grigsby testified that he is a school teacher, was in appellee's office a few days before the March, 1939, term of circuit court convened, and talked with appellee in the office. He said: "Well, I was in there and he said something about me being on the jury, and I told him 'yes, I was, but I didn't guess I would get to serve' and he wanted to know the reason. I told him that I was teaching school and didn't have any one to take my place. He suggested to me that I could let his wife take my place and me go ahead and serve, and I told him that I didn't think they would do it. . . . He wanted to know if my wife could take my place. . . . I told him I didn't know whether I could do it or not, that she needed to be at home, and what I would get up here wouldn't justify me to stay out of the schoolroom and let her leave her work." He said he and appellee had always been good friends and that he had supported him in his campaigns for office. "He said he would like for me to serve if I could, that he felt like I was a friend to him and would treat him right . . . I believe he said that he felt like I would be capable of rendering a fair verdict, and after I heard the evidence in the cases that he had, that he felt like that I . . . said that after I heard the testimony in the cases that he had that he felt sure I would see fit to render him a verdict. . . . He asked me if I knew any one else on the jury that was not a friend to him, that might not give him a fair trial; to let him know if there was any one else I could talk to that would not be fair, and to let him know." He testified he talked to juror Fallis, a second cousin, and told him appellee had a case coming up for trial and would expect "us" to treat him right. He admitted that he had had a drink on that day, but denied he was drunk. Appellee denied that he had any such conversation with Grigsby, but admitted that the prospective juror was in his office and was drunk at the time. The

fact that they were close personal and political friends is not disputed. The fact that Grigsby did serve on the jury panel is a matter of record and the fact that he did have such a talk with Fallis is corroborated by Fallis who said that Grigsby told him after the end of the first week of court that "Roy" had a case coming up next week and he "Roy" wanted the witness and Grigsby to help him out. Fallis served on the Fooks case. This witness is also a good friend of appellee.

We think this evidence must be accepted as true. If not, why would these two friends perjure themselves to do him a great wrong? We are willing to accept the court's implied finding that Robbins might perjure himself to injure appellee, because of the enmity and hatred that appellee says existed between them, even though his firm had represented Robbins and settled a claim for him against an oil company for personal injuries, and even though he had frequented appellee's firm's office in the company of Ol Davis who was also active as a jury fixer with Robbins, but who did not testify in this case.

The only evidence of attempted bribery of jurors comes from Robbins and his activity with certain prospective jurors. There is no proof that either Grigsby or Fallis was offered a bribe. But the evidence is quite convincing that appellee was very much concerned that Grigsby serve on the jury and also serve as an informer to him of those on the jury who might be unfriendly to him. So great was his concern that he offered to have his wife teach school for the juror during his service on the panel.

We think this conduct highly unethical, and unbecoming to a member of the bar. The statute, § 8314, Pope's Digest, requires petit jurors to have the same qualifications as grand jurors, prescribed by § 8312, that is "persons of good moral character, of approved integrity, sound judgment and reasonable information." By §§ 3244 and 3248 the administration of public justice is further sought to be protected by the imposition of heavy fines and imprisonment for the misconduct of

jurors and for the corruption or the attempt to corrupt a juror.

The fact that appellee himself talked to Grigsby as set out above shows a successful attempt to thwart the administration of justice and a contempt for or a disregard of its orderly procedure. The jury system is hoary with age. It is guaranteed by both the state and federal constitutions. It must and will be preserved, if trial courts will select jury commissioners with the qualifications prescribed for petit jurors as required by § 8306 of Pope's Digest and require them to select petit jurors with the same qualifications—"persons of good moral character, of approved integrity, sound judgment and reasonable information," will not permit lawyers, litigants or their agents to discuss pending litigation privately with them, and if the attempt is made it will be reported by such jurors to the court for proper punishment. A juror that is not fair is not worthy to be a juror, and a lawyer that will seek to gain an unfair advantage over his brother lawyer or the adverse litigant by secret contact or conversation with a juror or one summoned to be such so as to render him unfair prostitutes his high calling to that of a shyster, and is deserving of punishment at the hands of the court. The power to regulate the practice of law is vested in this court under amendment No. 28 to the constitution. Under rules adopted by this court, power to try disbarment proceedings is vested in either the circuit judge or chancellor and by this court on appeal *de novo*.

For the violation of the rules of ethics hereinbefore stated we think appellee should be suspended as a member of the bar of the courts of this state for the period of one year from the date this opinion becomes final. The judgment of the trial judge is reversed and judgment as indicated will be entered here. It is so ordered.

HUMPHREYS and MEHAFFY, JJ., dissent.

424

MEHAFFY, J., (dissenting). I do not agree with the majority in reversing this decree. The majority admits that one witness, Clyde Robbins, is a "self-confessed tool" of appellee, but in its opinion it is stated:

"This witness was very successfully impeached and the trial court apparently put no credence in his testimony and we cannot say that he should have been believed in view of his bad reputation and his criminal record, although he is corroborated in the fact that he did interview both Brady and Hutchinson in an attempt to 'fix' them for appellee by both of them."

It is said in the opinion, however: "But conceding that Robbins is not worthy of belief, still we have the testimony of jurors Charley Grigsby and W. F. Fallis to consider."

The chancellor who tried this case has had considerable experience as a trial lawyer, has heard witnesses testify, has observed their demeanor on the stand, and in this case the witnesses testified in his presence. He had a much better opportunity to pass upon the credibility of such witnesses and the weight to be given to their testimony than do the members of this court. We have nothing here but the printed record, while the trial court had the opportunity to observe the demeanor of the witnesses on the stand.

"Among the advantages that the jury always has over the court which is asked to review its finding is the opportunity given to weigh witnesses, as well as their testimony. From the moment that a witness is called to the stand until he leaves it and is lost to view his physical and mental characteristics are subject to the analysis of 12 students of human nature, having different degrees of capacity, and more or less experience, who pass judgment upon him as well as his story." *Gorman* v. *Hand Brewing Co.*, 28 R. I. 180, 66 Atl. 209.

The disadvantages of the appellate court in weighing evidence is well stated as follows: "In reviewing the determination of a trial court upon questions of fact, an appellate tribunal is not warranted in reversing upon the sole ground that, in its opinion, the trial court should

have reached a different conclusion upon conflicting evidence. Any other rule would nullify the peculiar advantages which the original tribunal possesses, and which have been described in another part of this work, in observing the manner and appearance of the witnesses produced, and the various physical and mental peculiarities by which the mind of the professional observer determines the degree of credit which ought prudently to be attached to oral testimony.'' 2 Moore on Facts, 1419.

Roy Richardson, the appellee, testified that it is not true that he talked personally with Charley Grigsby. Witness recalled Grigsby's visit to the office, but he said that Grigsby was drunk and was there only a short time, and that nothing was said about any juror, or anything else concerning a lawsuit.

The opinion of the majority says that the fact that appellee himself talked to Grigsby, as set out in the opinion, shows a successful attempt to thwart the administration of justice and a contempt for, or disregard of, its orderly procedure.

Roy Richardson swears positively that he did not talk to Grigsby about the lawsuit or the jurors. If there is any truth in what Grigsby says about it, he himself was an accomplice and there is not a syllable of corroboration. The statement in the opinion is that he was corroborated by the jurors to whom he talked, but of course, no one will contend that that was a corroboration of anything Grigsby claimed that Richardson had said.

Under our law, no one can be convicted of a felony on the testimony of an accomplice, unless corroborated, and this conviction is worse than being convicted of a felony.

The statute on the testimony of an accomplice reads as follows: ''A conviction can not be had in any case of felony upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows that the offense was committed, and the circumstances thereof. Provided, in misdemeanor cases a conviction may be had

upon the testimony of an accomplice." § 4017, Pope's Digest.

The opinion states that the testimony of Grigsby and Fallis must be accepted as true. The chancellor, who saw them, heard them testify and had every opportunity to judge of their credibility, did not think so. The opinion then asks why, if these statements are not true, would these two friends perjure themselves to do him a great wrong?

I do not know why they would do this. I do not know why Judas, for thirty pieces of silver, betrayed Christ; but I know that he did do it. In order to point out the Master to his enemies, Judas approached him saying, "Hail, Master!" and kissed him, but I do not know why he did it, except it appears very reasonable that Judas was not His friend.

The action of Grigsby and Fallis does not seem to me to have been the action of friends. One law that seems to me to have been entirely overlooked by the majority is the law announced by the Master in Chapter 7, verse 12, of St. Matthew. It is as follows: "Therefore all things whatsoever ye would that men should do to you, do ye even so to them; for this is the law and the prophets."

As a further evidence that the trial court had a better opportunity to judge of the credibility of witnesses than this court has, it may be said: "The tongue of the witness is not the only organ for conveying testimony to the jury; but yet it is only the words of a witness that can be transmitted to the reviewing court, while the story that is told by the manner, by the tone and by the eye of the witness must be lost to all but those to whom it is told." Carter v. Bennett, 4 Fla. 283; Moore on Facts, vol. 2, pp. 1422, 1423.

" 'It can scarcely be repeated too often,' said the Illinois Supreme Court, 'that the judge and jury who try a case in the court below have vastly superior advantages for the ascertainment of truth and the detection of falsehood over this court sitting as a court of review. All we can do is to follow with the eye the cold words

of a witness as transcribed upon the record, knowing at the same time, from actual experience, that more or less of what the witness actually did say is always lost in the process of transcribing. But the main difficulty does not lie there. There is an inherent impossibility of determining with any degree of accuracy what credit is justly due to a witness from merely reading the words spoken by him, even if there were no doubt as to the identity of the words. However artful a corrupt witness may be, there is generally, under the pressure of a skillful cross-examination, something in his manner or bearing on the stand that betrays him, and thereby destroys the force of this testimony. Many of the real tests of truth by which the artful witness is exposed, in the very nature of things cannot be transcribed upon the record, and hence they can never be considered by this court.' " Vol. 2, Moore on Facts, p. 1419, *et seq.*

I think that the chancellor had a very much better opportunity to know the truth than have the members of this court. I am sure that he rendered a decree according to his best judgment, and I think it should be affirmed.

Mr. Justice HUMPHREYS agrees with me in this dissent.